James Naff GIBSON, Petitioner–Appellee,

v.

George ORTIZ, Warden, Respondent–Appellant.

No. 03–56518.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 2, 2004.

Filed Oct. 4, 2004.

---

**12.** *People v. Holmes*, 32 Cal.4th 432, 9 Cal. Rptr.3d 678, 84 P.3d 366, 372 (2004).

**13.** Op. at 805.

**14.** *Taylor*, 495 U.S. at 602, 110 S.Ct. 2143.

**15.** *Corona–Sanchez*, 291 F.3d at 1211.

Ralph H. Goldsen, Goleta, CA, for the petitioner-appellee.

Bill Lockyer, Attorney General of the State of California; Robert R. Anderson, Chief Assistant Attorney General; Pamela C. Hamanaka, Senior Assistant Attorney General; Kenneth C. Byrne, Supervising Deputy Attorney General; and Michael C. Keller, Deputy Attorney General, Los Angeles, CA, for the respondent-appellant.

Before: KLEINFELD, WARDLAW, and BERZON, Circuit Judges.

WARDLAW, Circuit Judge:

Warden George Ortiz appeals the district court's grant of the writ of habeas corpus to petitioner James Naff Gibson. The district court found that the use of California Jury Instruction, Criminal ("CALJIC") No. 2.50.01, which pertains to evidence of prior sexual offenses, allowed the jury to find Gibson guilty of the charged offenses by relying on facts found only by a preponderance of the evidence. This lessened burden of proof violated Gibson's due process rights under *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), which requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt. Thus, the constitutionally infirm instruction deprived Gibson of a "jury verdict within the meaning of the Sixth Amendment." *Sullivan v. Louisiana*, 508 U.S. 275, 280, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). Because the California Court of Appeal's verdict was contrary to *Winship* and *Sullivan*, we affirm.

## I.

### JURISDICTION and STANDARD OF REVIEW

■ We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and review *de novo* a district court's decision to grant a habeas petition under 28 U.S.C. § 2254. *See Ramirez v. Castro*, 365 F.3d 755, 762 (9th Cir.2004). Under the provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 ("AEDPA"), we may grant habeas relief only if the state court's adjudication of the merits of a habeas claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade*, 538 U.S. 63, 70–71, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

■ Section "2254(d)(1)'s 'contrary to' and 'unreasonable application' clauses have independent meaning." *Bell v. Cone*, 535 U.S. 685, 694, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002). A state court's decision is contrary to clearly established federal law if it (1) applies a rule that contradicts the governing law set forth in Supreme Court cases, or (2) confronts a set of facts materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *Price v. Vincent*, 538 U.S. 634, 640, 123 S.Ct. 1848, 155 L.Ed.2d 877 (2003); *Williams v. Taylor*, 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court's decision is an unreasonable application of clearly established federal law if "the state court identifies the correct governing legal principles from [Supreme Court] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

Because the California Supreme Court denied Gibson's petition without comment, we look to the last reasoned judgment of the state court—in this case, that of the California Court of Appeal—to determine if the ruling was contrary to, or an unreasonable application of, federal law. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

## II.

### BACKGROUND

The facts of this case are brutal, ugly, and, with the notable exception of the

charged offenses, largely undisputed. Alma Flores[1] met James Gibson around 1990 when the two were co-workers. After three months of dating, Flores and Gibson began living together in an apartment in El Rio, California. They began arguing shortly thereafter, mostly about money, but maintained a sexual relationship.

The relationship between Flores and Gibson grew violent after they moved to a house in Camarillo. During a heated argument, Gibson pulled Flores to her feet by her hair, shouted insulting and derogatory statements at her, and told her he did not love her. Shoving her to the bed, Gibson put a rifle in Flores's "front" and in her face. Gibson told Flores he was "Freddy Krueger," and proceeded to break a glass and cut his hand with it. When Gibson left the room, Flores escaped through a window. Soon after, she made a failed attempt at suicide. Flores never notified police of the incident because she loved Gibson. Shortly after their altercation, Gibson left California for Virginia.

Approximately one month later, Gibson returned to California and contacted Flores with the hope of reconciling. Flores refused him. However, Gibson was apparently undeterred. He went to a party at Flores's family's home, met up with Flores again, and took her for a drive to buy cigarettes. He drove at a high rate of speed and told Flores that if they did not reconcile, they were both going to die. Gibson also threatened to mutilate Flores's vagina with a knife so that she would be "unfit" for another man.

Gibson and Flores moved in together once again. After 18 months together, they separated for three months, but reconciled again in March of 1994. At the time of their reconciliation, Flores had developed problems with her immigration status and was at risk of being deported.

The pair married that month, but the change in marital status failed to bring any change in the violent nature of their relationship. Gibson and Flores continued to fight over Gibson's perpetual unemployment and lack of income. During their fights, which occurred every few months, Gibson would strike Flores.

At some point after they were married, Flores informed Gibson that she no longer desired to have sex with him.[2] Although Flores believed that she and Gibson needed to stay together for two years for immigration purposes, his abusive behavior and infidelity made her unwilling to continue the sexual aspect of their relationship.

According to Flores, a familiar pattern ensued: Gibson would return home drunk, force or rip Flores's clothes off, and pry open her legs. Although Flores would struggle against him, he regularly overpowered her. Without Flores's consent, Gibson would orally copulate her, penetrate her vaginally with his fingers, and force her to orally copulate him. Some of the earlier incidents involved forced vaginal intercourse, although the later ones did not.

Flores's testimony regarding her refusal to have sex with Gibson was not fully consistent. She testified that she told Gibson she did not want to have sex with him each time he forced her. When asked if

---

1. Although Alma Flores took her husband's name when they married, we refer to her as "Flores" to avoid confusion.

2. Flores gave conflicting accounts as to when they stopped having consensual sex, ranging anywhere from two months to two years after they were married. Because Flores testified that the assaults occurred monthly, the number of incidents varies depending on when the consensual sexual relationship ended.

she told him no each time, however, she replied "Well, no, but just to tell him—well, I think that when a person wants to have sex ... he has it and doesn't have to force anybody."

Flores did notify police authorities of Gibson's actions on two separate occasions in 1996, but never pressed charges against him. Flores called the police once after Gibson had raped her, but did so because Gibson also wanted to take money from her and she expected that their argument would lead to physical violence. Although the police came to the their apartment, they did not arrest Gibson. Flores did not tell the authorities that she had been raped.

Flores also called the authorities with a battery complaint. She told the officer who came to the apartment that Gibson had struck her about the face and head. Although she did not want Gibson prosecuted, she wanted information about her options and said she would obtain a divorce and a restraining order the following day. She did not do so. The officer's report noted that "there were no marks on her for prosecution." Gibson was not charged with any offense.

Flores testified that she told two neighbors in their apartment complex, Norma Gerardo and Maria "Lucy" Gutierrez, about Gibson's abusive behavior. Lucy once asked Flores why she was crying so hard; when Flores explained that Gibson had forced himself on her, Lucy told her, "that's illegal." According to Flores, Norma was also present for this conversation. At trial, however, both Lucy and Norma testified that Flores never mentioned anything about Gibson forcing himself on her, nor did either ever hear noise or sounds of struggle from the Gibsons' apartment. Neither Norma nor Lucy ever saw signs of bruising or physical injury on Flores.

Gibson was not charged with any offense arising from evidence that he allegedly forced Flores to have sex with him anywhere from five to twenty-one times after she told him she wished to discontinue their sexual relationship. Rather, an incident at a sleep-over party hosted by Flores in 1997 began a sequence of events that ultimately gave rise to the charged offenses. The party was for Flores's twelve-year-old goddaughter, Becky, and two of Becky's friends, Francine and Yajaira. Also present at the sleep-over were Becky's father, Manuel (with whom Gibson had falsely accused Flores of having an affair), and Becky's brother, Felix. Before Gibson arrived home, Flores told Becky that if she heard Flores crying, she was to call 911.

When Gibson arrived home, he took Flores into the bedroom, either forcibly removed her clothing or ordered her to do it, and overpowered her. Gibson forcibly orally copulated and digitally penetrated Flores. He attempted to force her to orally copulate him, but she said no and was apparently able to fight him off. She was unable to call the police because Gibson had disconnected the telephone in the bedroom.

Becky and her friends heard a door slam and heard the cries of Flores saying "no" and "stop." Francine testified that she heard sounds of someone being hit. Becky was going to call the police but Manuel forbade her, telling her it was none of her business.

The morning after the alleged assault, the three girls went into the Gibsons' bedroom. Becky testified that it smelled like "forced sex."

On December 28, 1997, when Becky was once again staying with Flores, Gibson offered both Becky and Flores some alcohol. Becky became drunk and vomited. Flores, however, refused to drink, which

angered Gibson to the point where he threw the alcohol in her face. When Flores attempted to prevent Becky from drinking, Gibson pushed Flores against the couch in their living room and pulled her by the hair.

While Flores remained in the living room, Gibson and Becky went into the bedroom. Later that evening, Flores looked inside the bedroom and saw Gibson kissing Becky and lying next to her on the bed. When Flores attempted to intervene, Gibson chased her from the room, kicked her, and hit her on the head. He then returned to Becky in the bedroom.

Flores heard Becky calling for her twice during the night. In the morning, Becky noticed she was not wearing her bra and began crying. Becky asked Flores why she had left her alone with Gibson. When Gibson awoke, he hit Flores and told her he did not love her.

Gibson was taken into custody on December 29, 1997, on child molestation charges. Once in custody, he repeatedly denied molesting Becky, saying that he only came near Becky's breasts when he was cleaning the vomit off of her shirt. In January of 1998, two weeks following Gibson's arrest, the police questioned Flores about Gibson's possible molestation of Becky. At that time, Flores told the police that Gibson had assaulted her.

Gibson was tried on October 6, 1998, on one count of committing a lewd act upon a child, one count of corporal injury to a spouse, two counts of forcible oral copulation, and one count of anal and genital penetration by foreign object or force or violence. Over Gibson's objection, evidence of the prior uncharged sexual assaults that he committed against Flores was admitted under Cal. Evid.Code § 1108, which allows such evidence to be introduced as long as its probative value is not substantially outweighed by its prejudicial value. *See* Cal. Evid.Code § 352. Because evidence concerning Gibson's prior uncharged sexual offenses was admitted, the trial court instructed the jury pursuant to CALJIC Nos. 2.50.01 and 2.50.1 (6th ed.1996).

At the time of trial, CALJIC No. 2.50.01 read in part:

> Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense on one or more occasions other than that charged in the case....

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.

> Unless you are otherwise instructed, you must not consider this evidence for any other purpose.[3]

CALJIC No. 2.50.01.[4]

The instruction was read in tandem with a modified version of CALJIC No. 2.50.1, which provided:

---

3. The instruction also defined "sexual offense" as:

    A. Any conduct [as alleged in Counts III, IV & V]. The elements of these crimes are set forth elsewhere in these instructions.
    B. Contact, without consent, between any part of the defendant's body or an object and the genitals or anus of another person.

    C. Contact, without consent, between the genitals or anus of the defendant and any part of another person's body.
    No. 2.50.01.

4. The jury also received CALJIC No. 2.50.02, which is identical in all aspects to No. 2.50.01, except that it addresses prior acts of domestic violence.

· Within the meaning of the preceding instructions, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other sexual offenses and/or domestic violence.

CALJIC No. 2.50.1.

On October 13, 1998, the jury acquitted Gibson on the child molestation charge, but convicted him on the remaining four counts. He was sentenced to four years in prison on Count II, the corporal injury to spouse charge. On Counts III, IV, and V, the forcible oral copulation and genital penetration charges, he was sentenced to three terms of eight years to run concurrently.

On direct appeal, Gibson challenged the use of CALJIC Nos. 2.50.01 and 2.50.1, claiming that the instructions had unconstitutionally permitted the jury to find him guilty of the charged offenses based on a preponderance of the evidence burden of proof. On November 1, 1999, the California Court of Appeal, Second Appellate District, rejected his claim:

> CALJIC No. 2.50.1 does not provide that the current crime may be proved by a preponderance of the evidence. It expressly provides that only the *prior crimes* may be proved by a preponderance. It correctly states the legal principle and does not eliminate the prosecution's obligation to prove beyond a reasonable doubt each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt of the current crime charged. The trial court properly instructed regarding the presumption of innocence, the prosecutor's burden of proof beyond a reasonable doubt, and the definition of reasonable doubt. It is not reasonably likely the jury applied the instructions to convict [petitioner] by a preponderance of the evidence. When viewed as a whole, the instruction concerning the uncharged crime does not undermine the instructions concerning the presumption of innocence and the prosecutor's burden of proof beyond a reasonable doubt.

*People v. Gibson,* No. B129722, slip. op. at 7 (Cal.Ct.App. Nov. 1, 1999) (emphasis in original) (quotations and citations omitted).

In 1999, CALJIC No. 2.50.01 was revised to clarify how jurors were required to evaluate the defendant's guilt relating to the charged offense if they found that he had committed a prior sexual offense. The following paragraph was added to the end of the otherwise unchanged instruction:

> However, if you find by a preponderance of the evidence that the defendant committed [a] prior sexual offense[s], that is not sufficient by itself to prove beyond a reasonable doubt that [he] [she] committed the charged crime[s]. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

CALJIC No. 2.50.01 (7th ed.1999).

On the same day the Second District Court of Appeal issued its opinion in this case, the California Supreme Court issued *People v. Falsetta,* 21 Cal.4th 903, 89 Cal. Rptr.2d 847, 986 P.2d 182 (Cal.1999). *Falsetta* addressed the constitutionality of Cal. Evid.Code § 1108, which allows the admission of evidence of prior uncharged sex offenses, and held that the admission of such evidence did not violate due process.

The *Falsetta* court, however, relied on the language of revised CALJIC No. 2.50.01 to find that § 1108 evidence comported with due process. The court reasoned that no due process violation occurs when § 1108 evidence is admitted because "at the defendant's request, the jury may be told that evidence of his other sexual offenses is not sufficient by itself to prove his commission of the charged offense." *Falsetta*, 89 Cal.Rptr.2d 847, 986 P.2d at 192. The language upon which *Falsetta* relies was not part of CALJIC No. 2.50.01 at the time of Gibson's trial; CALJIC No. 2.50.01 contained no such limitation prior to its 1999 revision.

Gibson petitioned for rehearing in the Court of Appeal, contending that (1) the court failed to adequately discuss his instructional error claim since it made no mention of CALJIC No. 2.50.01; (2) the 1999 revision of CALJIC No. 2.50.01 and the California Supreme Court's decision in *Falsetta* supported Gibson's argument that the version of CALJIC No. 2.50.01 read to his jury was unconstitutional; and (3) the court had disregarded a substantial body of recent case law that supported Gibson's instructional error claim.

In its Opinion on Rehearing, the Court of Appeal applied *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), concluding that the

> trial court properly instructed regarding the presumption of innocence, the elements of the offense, the prosecutor's burden to prove each of those elements beyond a reasonable doubt, and the defi-

nition of reasonable doubt. It is not reasonably likely the jury applied the instructions to convict appellant by a preponderance of the evidence.

*People v. Gibson*, No. B129722, slip. op. at 6 (Cal. Ct.App. June 5, 2000). The court found that although the challenged instruction was ambiguous, taken as a whole, the jury instructions did not lessen the prosecution's burden of proof.

Gibson then filed a second petition for rehearing. On June 29, 2000, the Court of Appeal issued an order modifying its opinion denying rehearing. The modified order squarely addressed Gibson's arguments concerning CALJIC No. 2.50.01:

> We are aware that CALJIC No. 2.50.01 in the form given here did not admonish the jury not to convict solely because it found Gibson committed the prior offenses and that such language subsequently was added upon the *Falsetta* court's recommendation. But the omission of the admonishment is not fatal to the instruction.[5]

*People v. Gibson*, No. B129722, slip op. at 1–2 (Cal. Ct.App. June 9, 2000) (citation omitted). The state appellate court looked to "the facts and manner in which the case was tried," finding that:

> The direct evidence against Gibson was compelling. The prior acts, although serious, were not as aggravated as the charged acts. The testimony of Becky provided corroboration of the charged acts.

*Id.* at 2. It therefore concluded:

> [T]he instructions concerning the uncharged crimes do not undermine the

---

5. The order also took note of the cases that Gibson had cited in support of his due process argument. Although the order acknowledged that two recent appellate court decisions, *People v. Vichroy*, 76 Cal.App.4th 92, 90 Cal.Rptr.2d 105 (1999) and *People v. Orellano*, 79 Cal.App.4th 179, 93 Cal.Rptr.2d 866 (2000), had held that the prior version of CALJIC No. 2.50.01 was constitutionally deficient, it also noted that *People v. James*, 81 Cal.App.4th 1343, 96 Cal.Rptr.2d 823 (2000), upheld the use of such an instruction. In *James*, however, overwhelming evidence made it clear beyond a reasonable doubt that the verdict would have been the same with a proper instruction.

instructions concerning the presumption of innocence and the prosecutor's burden of proof beyond a reasonable doubt. Indeed we are convinced beyond a reasonable doubt the jury's verdict was based on all the evidence.

*Id.* at 3. Gibson's petition for review in the California Supreme Court was denied without comment on August 16, 2000.

Gibson next petitioned for a writ of habeas corpus in the United States District Court for the Central District of California, arguing that the use of CALJIC Nos. 2.50.01 and 2.50.1 violated his due process rights. On August 4, 2003, United States District Judge Cormac J. Carney adopted the magistrate judge's report and recommendation that Gibson's petition be granted. Judge Carney ruled that the state court had rendered a decision that was both contrary to, and an unreasonable application of, clearly established Supreme Court precedent because it had allowed Gibson to be convicted under the preponderance of the evidence standard rather than by a reasonable doubt standard.

Warden Ortiz timely appealed. In part because Ventura County indicated it would not retry Gibson, the district court denied the warden's motion to stay the mandate pending appeal.[6] We also denied a motion by the warden for a stay pending the appeal.

### III.

### DISCUSSION

The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove every element charged in a criminal offense beyond a reasonable doubt, a proposition of which there could be no doubt when Gibson was tried. *See*

*Winship,* 397 U.S. at 364, 90 S.Ct. 1068. If the jury is not properly instructed that a defendant is presumed innocent until proven guilty beyond a reasonable doubt, the defendant has been deprived of due process. *See Middleton v. McNeil,* —— U.S. ——, ——, 124 S.Ct. 1830, 1832, 158 L.Ed.2d 701 (2004); *Taylor v. Kentucky,* 436 U.S. 478, 485–86, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978). Any jury instruction that "reduce[s] the level of proof necessary for the Government to carry its burden . . . is plainly inconsistent with the constitutionally rooted presumption of innocence." *Cool v. United States,* 409 U.S. 100, 104, 93 S.Ct. 354, 34 L.Ed.2d 335 (1972).

■ Although the Constitution does not require jury instructions to contain any specific language, the instructions must convey both that a defendant is presumed innocent until proven guilty and that he may only be convicted upon a showing of proof beyond a reasonable doubt. *See Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 127 L.Ed.2d 583 (1994). "[T]he essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings." *Sullivan,* 508 U.S. at 281, 113 S.Ct. 2078 (emphasis in original). Where such an error exists, it is considered structural and thus is not subject to harmless error review. *See id.* at 280–82, 113 S.Ct. 2078. However, if a jury instruction is deemed "ambiguous," it will violate due process only when a reasonable likelihood exists that the jury has applied the challenged instruction in a manner that violates the Constitution. *Estelle,* 502 U.S. at 72, 112

---

**6.** In denying the stay, Judge Carney found both that the Warden was unlikely to succeed on the merits and that he would not suffer irreparable injury since Ventura County had indicated it would not retry Gibson.

S.Ct. 475. Any challenged instruction must be considered in light of the full set of jury instructions and the trial record as a whole. *See Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973).

With this framework in mind, we examine the particular instructions given in Gibson's trial.

Several jury instructions were read that described various burdens of proof and types of evidence. The instruction based on CALJIC No. 2.00 explained in part that:

> Circumstantial evidence is evidence that, if found to be true, proves a fact from which an inference of the existence of another fact may be drawn.

> An inference is a deduction of fact that may logically and reasonably be drawn from another fact or group of facts established by the evidence.

The general rules governing circumstantial evidence were then outlined using CALJIC No. 2.01, "Sufficiency of Circumstantial Evidence—Generally," which was the first instruction to mention the reasonable doubt standard:

> However, a finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion.

> Further, each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be

found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt.

After No. 2.01, the reasonable doubt standard was incorporated into two further instructions: CALJIC No. 2.61, which references the reasonable doubt standard in the context of a defendant's decision not to testify,[7] and CALJIC No. 2.90, the instruction regarding the presumption of innocence. CALJIC No. 2.90 instructed the jury that:

> A defendant in a criminal action is presumed to be innocent until the contrary is proved, and in case of a reasonable doubt whether [his] guilt is satisfactorily shown, [he] is entitled to a verdict of not guilty. This presumption places upon the People the burden of proving [him] guilty beyond a reasonable doubt.

Notably, once the presumption of innocence instruction was read to the jury, the reasonable doubt standard was not included in any subsequent instruction.

After giving the general instructions regarding definitions and burden of proof, the trial judge read the jury specific instructions pertaining to the elements of the charged offenses. It was in this context that the court gave the § 1108 evidence of prior sexual assault and domestic abuse instructions.

The instruction given to the jury in this case, CALJIC No. 2.50.01, specifically read:

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant

7. "In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against [him]. No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against [him] on any such essential element." CALJIC No. 2.61.

had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.

We presume that the jury followed these instructions, see *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"), and proceeded on the basis that if it found Gibson had committed prior sexual offenses, it was then permitted to infer that Gibson had committed the charged offenses.

Had the jury instructions ended with CALJIC No. 2.50.01, our inquiry would have ended with a denial of Gibson's petition. We would have assumed that the jury followed, with respect to the prior sexual offenses evidence, the only standard regarding burden of proof they had received: reasonable doubt. The trial court, however, went on to instruct the jury with CALJIC No. 2.50.1, which ascribed a lesser burden of proof for evidence of previous sexual offenses. The instruction specifically referenced CALJIC No. 2.50.01 and outlined the applicable burden of proof for the prior sexual offenses:

> Within the meaning of the preceding instructions the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed sexual offenses and/or domestic violence other than those for which he is on trial.

CALJIC No. 2.50.01, in turn, provided that the jury could infer that the defendant committed the charged crime if it found "that the defendant committed a prior sexual offense." Therefore, the interplay of the two instructions allowed the jury to find that Gibson committed the uncharged sexual offenses by a preponderance of the evidence and thus to infer that he had committed the *charged* acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence.

■ When viewed as a whole, there is nothing ambiguous or confusing about the challenged instructions: CALJIC Nos. 2.50.01 and 2.50.1 told the jury exactly which burden of proof to apply. However, contrary to the Supreme Court's clearly established law, the burden of proof the instructions supplied for the permissive inference was unconstitutional.

We therefore agree with the district court and hold that the challenged instructions are constitutionally infirm. The 1996 version of CALJIC No. 2.50.01 runs directly contrary to *Winship's* maxim that a defendant may not be convicted except "upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Winship*, 397 U.S. at 364, 90 S.Ct. 1068; *see also Taylor*, 436 U.S. at 485–86, 98 S.Ct. 1930 ("[T]he Due Process Clause of the Fourteenth Amendment must be held to safeguard 'against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt.' ") (citations omitted).[8]

We are unpersuaded by the warden's argument that the instructions, when read as a whole, properly set forth the reasonable doubt standard. Contrary to the Warden's assertions, that the jury was given instructions regarding the presumption

---

8. The state court relied on *Estelle v. McGuire* in finding that there was not a reasonable likelihood that, as a whole, the jury misunderstood the instruction. However, reliance on *Estelle* presupposes that the instruction is ambiguous. As explained above, we find the challenged instructions unambiguous as to inferences permitted by evidence of uncharged acts. *Estelle* is therefore inapposite.

of innocence, the meaning of "beyond a reasonable doubt," and the use of circumstantial evidence, does not offset the preponderance instruction given in CALJIC No. 2.50.1. That instruction, read together with CALJIC No. 2.50.01, permitted an impermissible inference. The jury was never told how, or if, the two standards of proof set forth in the instructions should be harmonized. Rather, it received only a general instruction regarding circumstantial evidence, which required proof beyond a reasonable doubt, and a specific, independent instruction relating to previous sexual abuse and domestic violence, which required only proof by a preponderance of the evidence.

The explicit language of CALJIC No. 2.50.1 carves out of the general reasonable doubt standard a specific exception for prior evidence of sexual abuse and domestic violence, which carries only a preponderance burden. We find no reason to deviate from our well-settled rule of construction that the specific controls the general. *See Flores–Chavez v. Ashcroft*, 362 F.3d 1150, 1158 (9th Cir.2004). *Francis v. Franklin*, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985), supports application of this principle to jury instructions. There, the Supreme Court held that the use of a contrary general instruction does not automatically cure a deficient specific instruction. *Id.* at 320, 105 S.Ct. 1965. *Francis* involved conflicting instructions to a jury in a murder trial, which informed the jury both that once the state had proven the predicate facts that it had created a presumption of intent and that the presumption "may be rebutted." *Id.* at 309, 105 S.Ct. 1965. In holding that the general instructions regarding the government's burden of proof did not cure the specific defects in the language that allowed the government to impermissibly shift the burden of proof to the defendant, the Court stated:

Nothing in these specific sentences or in the charge as a whole makes clear to the jury that one of these contradictory instructions carries more weight than the other. *Language that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity.* A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict.

*Id.* at 322, 105 S.Ct. 1965 (emphasis added).

Because the trial court offered no explanation harmonizing the two burdens of proof discussed in the jury instructions, Gibson's jury was presented with two routes of conviction, one by a constitutionally sufficient standard and one by a constitutionally deficient one. As *Francis* makes clear, that the trial court instructed the jury generally with the correct standard does not mean that due process was not violated when an exception to that standard was not only presented to the jury, but offered as a possible means of conviction.

Moreover, the second paragraph of CALJIC No. 2.01 instructed jurors *generally* that any inference they make must be necessarily based upon facts proven beyond a reasonable doubt. This instruction squarely conflicts with the language of CALJIC No. 2.50.01, which instructed jurors that facts of prior alleged offenses need only to be proven by a preponderance of the evidence to support an inference that Gibson had committed the charged offenses. We are unpersuaded by the warden's argument that the jury would be able to discard that portion of CALJIC No. 2.01 providing that each fact that supports an inference must be based upon a reasonable doubt (as CALJIC No. 2.50.01's

standard negates), but would nevertheless follow the portion of CALJIC No. 2.01 that requires all facts essential to establishing guilt to be found beyond a reasonable doubt. The more logical conclusion is that the jurors understood the reasonable doubt standard of CALJIC No. 2.01 to apply to circumstantial evidence generally, as the instruction's title clearly states, and the preponderance of the evidence standard in CALJIC No. 2.50.01 to apply specifically to circumstantial evidence of prior sexual offenses.

That CALJIC No. 2.50.01 carves out an exception to the reasonable doubt burden of proof for evidence of prior sexual offenses was well articulated by the prosecutor at trial, who encouraged the jury to view this "powerful," special evidence through an unconstitutional lens. In closing, the prosecutor argued:

> If you find that the defendant—this is very important. If you find that the defendant committed these prior sexual offenses, you may, but are not required to, infer—you can infer that he has that disposition, that he's the kind of guy that does this. If you find that he has this disposition, you can infer that he was likely to and, in fact, did commit these crimes. That is how powerful 1108 evidence is. It allows you to determine that this guy is that kind of guy.

> All right. Now you know the burden of proof, and the Court told you the burden of proof of the crimes in this case, beyond a reasonable doubt. The burden of proof for 1108 evidence, however, is not beyond a reasonable doubt. The burden of proof—I have to prove this 1108 evidence for you to make these inferences by what is called a preponderance of the evidence. This preponderance of the evidence, what is that? Just a little bit more than not, 51 percent against 49. Shifting of the scale

slightly, more evidence than not is preponderance of the evidence.

> 1108 evidence, as I stated, by the preponderance of the evidence, shows that he has a disposition, that he is that kind of guy. If you understand that, *make these inferences that he did in fact commit these crimes, that is 1108.* (emphasis added).

Thus, despite general instructions regarding reasonable doubt, as the prosecutor explained, CALJIC No. 2.50.01 created an exception to the general rule for § 1108 evidence that allowed the jury to find only by a preponderance of the evidence that Gibson was indeed "that kind of guy" and that he "did in fact commit these crimes."

Although the prosecutor's arguments are weighted much less heavily in our analysis than the instructions of the trial judge, *see Boyde v. California,* 494 U.S. 370, 384–85, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), we nevertheless consider them as part of the context for evaluating the challenged instructions. *See Cupp,* 414 U.S. at 147, 94 S.Ct. 396. In light of the record as a whole, we would be hard-pressed to imagine how a reasonable juror would not be led to believe that he could convict Gibson solely on the basis of the prior uncharged sex offenses. And while we do not attribute any ill motive or bad faith, it is ironic that the State now urges us to reject the very interpretation of CALJIC No. 2.50.01 that the prosecution advanced to the jury.

CALJIC No. 2.50.01 permitted the jury to find Gibson guilty of the charged sexual offenses by merely a preponderance of the evidence, and therefore constituted structural error within the meaning of *Sullivan. See Sullivan,* 508 U.S. at 281–82, 113 S.Ct. 2078. In *Sullivan,* the trial court gave the jury a definition of reasonable doubt that had previously been held unconstitutional in *Cage v. Louisiana,* 498 U.S. 39, 111

S.Ct. 328, 112 L.Ed.2d 339 (1990). In invalidating Sullivan's conviction because of the unconstitutional standard of proof, the Supreme Court tied the Fifth Amendment requirement of proof beyond a reasonable doubt to the Sixth Amendment right to a jury trial, holding that "the jury verdict required by the Sixth Amendment is a jury verdict of *guilty beyond a reasonable doubt.*" *Id.* at 278, 111 S.Ct. 328 (emphasis added). A *Sullivan* error precludes harmless error review because no verdict within the meaning of the Sixth Amendment has been rendered. *Id.* at 280, 113 S.Ct. 2078; *see also Jackson v. Virginia,* 443 U.S. 307, 320 n. 14, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ("Our cases have indicated that failure to instruct a jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error"). The *Sullivan* court noted that without a proper verdict,

> [t]he most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been different* absent the constitutional error. That is not enough.

*Sullivan,* 508 U.S. at 280, 113 S.Ct. 2078 (emphasis in original).

We disagree that *Sullivan* is inapplicable because Gibson's jury was given at least one correct reasonable doubt instruction (CALJIC No. 2.01) and was also instructed on the presumption of innocence (CALJIC No. 2.90). We remain unconvinced that this circumstance removes the use of CALJIC No. 2.50.01 from the realm of constitutional error. CALJIC 2.50.01 gave the jury an alternate means of conviction with a lesser standard of proof than is required by the Constitution. When a court gives the jury instructions that allow it to convict a defendant on an impermissi-

ble legal theory, as well as a theory that meets constitutional requirements, "the unconstitutionality of any of the theories requires that the conviction be set aside." *Boyde,* 494 U.S. at 379–80, 110 S.Ct. 1190.

The rationale of *Boyde* provides the ultimate resolution for Gibson's case. Even if we were to assume that the jury had been properly instructed on the reasonable doubt standard as to its ultimate findings and *could* have found Gibson guilty of the charged offenses beyond a reasonable doubt, we have no way of knowing this assumption to be true. As the *Boyde* court reasoned, when alternate theories are involved, it is "equally likely that ... the verdict rested on an unconstitutional ground" as on a constitutional one. *Id.* at 380, 110 S.Ct. 1190 (citations omitted). Because it is as likely, if not more so in light of the closing argument, that the jury relied upon facts found by a preponderance of the evidence to find Gibson guilty of the charged offenses, his conviction cannot stand.

## CONCLUSION

Because the use of CALJIC No. 2.50.01 was contrary to *Winship* and *Sullivan,* the district court properly granted habeas relief under section 2254. We therefore **AFFIRM.**