**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VICTORINO LEMOS MEJIA,
            *Petitioner-Appellant,*

v.

SILVIA GARCIA; DARREL G. ADAMS;
JEANNE S. WOODFORD,
            *Respondents-Appellees.*

No. 06-16460

D.C. No.
CV-03-05489-OWW

OPINION

Appeal from the United States District Court
for the Eastern District of California
Oliver W. Wanger, District Judge, Presiding

Argued and Submitted
April 14, 2008—San Francisco, California

Filed July 25, 2008

Before: Ronald M. Gould, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge Gould

**COUNSEL**

Suzanne A. Luban, Oakland, California, for the petitioner-appellant.

Edmund G. Brown Jr., Attorney General of the State of California, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Brian G. Smiley, Supervising Deputy Attorney General, and Justain P. Riley, Deputy Attorney General, Sacramento, California, for the respondents-appellees.

## OPINION

GOULD, Circuit Judge:

Victorino Lemos Mejia ("Mejia") appeals the district court's denial of his petition for a writ of habeas corpus with respect to California state convictions for two counts of kidnapping, two counts of assault with a firearm, and one count of assault with a deadly weapon. We address: 1) whether the jury instructions read at Mejia's trial violated Mejia's due process rights under *In re Winship*, 397 U.S. 358 (1970), with respect to the kidnapping and assault convictions; and 2) whether the admission of evidence of prior uncharged sexual offenses against Mejia's daughter violated clearly established United States Supreme Court precedent. We have jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253, and we affirm. We conclude that the jury instructions did not violate Mejia's rights under *Winship* with respect to the kidnapping and assault convictions and that admission of the uncharged sexual offenses did not violate clearly established Supreme Court precedent.

## I

The facts concerning the horrific conduct for which Mejia was convicted are not difficult to grasp. In June of 1999, a California jury convicted Mejia of five counts of rape by force of fear, two counts of kidnapping, two counts of assault with a firearm, and one count of assault with a deadly weapon.[1]

---

[1]This summary of facts comes largely from the magistrate judge's findings and recommendations, which, in turn, were taken from the California

The allegations that underpin these convictions are more than unpleasant: In the summer of 1989, at the age of 18, the sister of Mejia's wife came to the United States to work as a baby-sitter for the Mejia family. After Mejia made arrangements to smuggle the sister, Maria, across the United States border with Mexico, Mejia and two of his young children met Maria in Los Angeles. Together, they took a bus to the county in which the Mejias lived, where Mejia brought Maria and the children to a motel.

From here matters degenerated quickly for Maria. When the children were asleep, the first alleged sexual assaults took place: Mejia put a knife to Maria's neck and told Maria that he wanted to have sexual intercourse with her. Maria pushed, kicked and tried to defend herself, telling Mejia that she did not want to have intercourse. While still holding the knife, Mejia tore off Maria's clothing and forced her to have sexual intercourse with him twice. For the two incidents of intercourse, Mejia was later charged with counts 1 and 2, each for forcible rape with an accompanying special allegation that Mejia used a deadly weapon, namely, a knife, to commit the offense. For his use of the knife, Mejia was also charged with count 3, assault with a deadly weapon.

Mejia told Maria that there was nothing she could do about being raped because no one would help her. He warned Maria not to tell her sister and his wife, Soledad, about what had happened in the motel, and Maria at first obeyed, fearing Mejia, but eventually told Soledad about the assaults.

When Mejia discovered this, he forced both women to get into his truck at gunpoint and drove them to an orange grove.

Court of Appeal opinion. The magistrate judge found the summary to be a correct and fair summary of the facts. A state court's factual determinations must be presumed correct, and a reviewing federal court must accept all factual findings that the state court makes, unless the petitioner can rebut "the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). The record supports this summary of the facts.

He ordered the women out of the truck and told them to walk to a field at gunpoint, threatening to kill them both. Mejia twice fired the gun at the women, once off to the side and once near their feet, and at some point put the gun to Soledad's head. He ordered Soledad to start walking so that he could shoot her in the back, and when Soledad complied, Mejia pointed the gun at Soledad and threatened to shoot her unless Maria agreed to have sexual intercourse with him. Maria agreed, afraid that Mejia might kill her sister. Mejia warned that he would kill Maria if she ever reported him to anyone. For his use of the firearm at the orange grove, Mejia was later charged with counts 4 and 5, assault with a firearm against Maria and Soledad, respectively. For the entire incident, Mejia was charged with counts 6 and 7, kidnapping Maria and Soledad, respectively, with a special allegation of the use of a firearm—a .25 caliber handgun.

After the three returned home, Mejia got on top of Maria and grabbed and touched her. Maria tried to push Mejia away, but she thought he had a gun, and he reminded her of her promise to have sex with him. Maria replied that she had made the promise to save Soledad's life. Mejia then forced Maria to have sexual intercourse with him, which later constituted count 8 against Mejia, with a special allegation that he used the .25 caliber handgun in committing the offense.

Later in the summer, after Maria unsuccessfully tried to lock herself in Mejia's car, Mejia raped her inside the family's empty residence. This would comprise count 11, forcible rape. Maria testified that over the three months that she lived at the house, Mejia came into the living room and raped her roughly twenty to thirty times. On one occasion, Soledad came into the living room and told Mejia to go back to his bedroom; this formed the basis for count 12. When Soledad and Mejia were back in their bedroom, Maria could hear Mejia beating Soledad.

Maria eventually escaped the house in October of 1989. Shortly thereafter, while staying with an acquaintance, Maria

reported Mejia to the police, who began an investigation. On January 30, 1990, Mejia was charged in Tulare County Superior Court with the twelve counts for which he was ultimately prosecuted, but he was not caught until nearly a decade later.

While the Mejia family was in Oregon in the early 1990s, Mejia's teenaged daughter, Norma, who was aware that the police were looking for her father, telephoned her former high school counselor in California and gave the counselor Mejia's location in Oregon. The counselor called the police. When Soledad found out about the call, she told Mejia, who then moved the family to Mexico. Around this time, Norma told Soledad that Mejia had been sexually abusing her.

In February of 1999, law enforcement caught up with Mejia and brought him back to California. In a police interview, Soledad, who had denied wrongdoing by Mejia when the police first investigated in the early 1990s, now said that she was afraid of Mejia and feared for her family, that she had lied earlier when she had denied knowledge of wrongdoing, and that Mejia had abused Maria. When interviewed, Norma also confirmed that Maria had been abused.[2]

At trial Soledad supported Maria's allegations: Soledad testified that Maria had told her about two weeks after coming to live with them that Mejia was abusing her; she confirmed Maria's account of the orange grove incident and Mejia's threats to kill the two women; she said that she had heard Mejia in the living room with Maria on occasion and had heard Maria tell Mejia to get off of her; and she seconded Maria's account of running away. Soledad repeated that when police first came to question her, she had lied, denying that Mejia had ever raped Maria or assaulted either of them, although she had given the police officer Mejia's gun, which

---

[2]Norma had already told police of her impression that Mejia had sexually assaulted Maria in 1990 when the police investigated.

she had hidden in her purse, and had told them where Mejia might be located.

The trial court admitted evidence of Mejia's acts of alleged uncharged sexual misconduct against Norma over defense objection, pursuant to California Evidence Code §§ 1108 and 352, which allow such evidence to be introduced so long as its probative value is not substantially outweighed by resulting prejudice. The trial court determined that the evidence's probative value outweighed its prejudicial effects. Norma then testified about previous incidents in which she alleged that Mejia had sexually abused her.

Norma told the jury that when she was about 15 years old, an investigator came to the village where her family was staying in Mexico. Mejia, thinking the investigator was looking for him, fled with the children to another village and hid in a hole in the ground. Norma claimed that, while they were hiding in the hole, Mejia told Norma that she was "going to lend him [her] private parts," and began touching her genital area. Norma stated that when they left the hole and went to a house for the night, Mejia took out his gun, placed it under his head and raped her. He later told her that it was her punishment for having called the police. After that, she testified, he raped her almost every night and at some point beat her with ropes.

Norma said that she eventually told her grandmother about the assaults, after which Mejia raped Norma again, telling her that he was raping her because she had told her grandmother about him. Norma also said that Mejia told her that if she ever told the police, he would kill her and her mother and throw their bodies onto the train tracks. Norma stated that Mejia continued to rape her until she moved out of the house in 1994.

At his trial, Mejia denied all allegations against him. He admitted to a relationship with Maria but claimed that it was

consensual and that he had never owned a handgun. He denied ever having molested Norma. Two of Mejia's children supported his version of events in their testimony.

The jury convicted Mejia of the five counts of rape by force of fear, the two counts of kidnapping, the two counts of assault with a firearm, and one count of assault with a deadly weapon. The jury acquitted him of count 9, penetration by a foreign object, and count 10, forcible oral copulation. It also found "not true" the special allegation that the count 8 forcible rape charge had been committed with a deadly weapon.

On direct appeal the California Court of Appeal modified Mejia's sentence but sustained the convictions. The California Supreme Court denied Mejia's petition for review in May of 2002. Mejia filed the present petition for writ of habeas corpus in early 2003. Before the district court issued its ruling, the government conceded that grant of the writ was appropriate as to the rape convictions under our precedent of *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), so only the remaining convictions were contested.

The district court adopted the magistrate judge's recommendation to reject Mejia's argument that introduction of Norma's testimony concerning uncharged sexual offenses violated his clearly established federal due process rights. However, the district court declined to adopt the magistrate judge's recommendation that *Gibson v. Ortiz* mandated a grant of the writ on all counts. Instead, the district court granted the writ only as to the five rape counts, determining that the jury instructions did not violate Mejia's clearly established rights as to the remaining counts. Mejia now appeals the partial denial of his habeas petition.

## II

We review *de novo* a district court's decision to grant or deny a petition for habeas corpus under 28 U.S.C. § 2254.

*Benn v. Lambert*, 283 F.3d 1040, 1051 (9th Cir. 2002). We review the district court's findings of fact for clear error. *Hendricks v. Calderon*, 70 F.3d 1032, 1036 (9th Cir. 1995), *cert. denied*, 517 U.S. 1111 (1996). When reviewing an allegation that a jury instruction is constitutionally infirm, if the instruction is ambiguous we must inquire whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the Constitution. *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991). If the error is structural, however, the error is not subject to harmless error review. *See Sullivan v. Louisiana*, 508 U.S. 275, 280-82 (1993).

Because Mejia filed his habeas petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, governs this court's review. Under 28 U.S.C. § 2254(d), we may not grant habeas relief for a claim adjudicated on the merits in state court unless the state's decision is contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court, or is based on an unreasonable determination of the facts in light of the evidence presented to the state courts. A state court decision is "contrary to" clearly established Supreme Court precedent if the state court "applies a rule that contradicts the governing law set forth" in Supreme Court decisions or "confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision . . . and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). It is an "unreasonable application" of clearly established Supreme Court precedent if it "correctly identifies the governing legal rule but applies it [objectively] unreasonably to the facts" of the case. *Id.* at 407-08, 410-11. We review the last reasoned state court decision to determine if it violated clearly established Supreme Court law. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991). Although section 2254(d) mandates that only Supreme Court precedential holdings clearly establish a right, circuit law may be "persuasive authority" on the question of whether a state court's determi-

nation was an unreasonable application of the Supreme Court's precedent. *Duhaime v. Ducharme,* 200 F.3d 597, 600-01 (9th Cir. 1999); *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003).

## III

**[1]** In *Winship*, the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires that the prosecution prove beyond a reasonable doubt every fact necessary to establish each element of the crimes charged. 397 U.S. at 364. A defendant is deprived of due process when the jury is not properly instructed that the defendant is presumed innocent until proven guilty beyond a reasonable doubt. *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). In other words, "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." *Sullivan*, 508 U.S. at 278. This requirement of proof of guilt beyond reasonable doubt is one of the foundations of our system of criminal procedure. The Constitution does not require the use of any particular words in advising the jury of the burden of proof as long as "taken as a whole, the instructions . . . convey the concept of reasonable doubt to the jury." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994).

Mejia argues that the jury instructions given at his trial rendered each of his convictions a violation of the *Winship* principle requiring proof beyond a reasonable doubt. The jury instructions[3] at issue are:

CALJIC No. 2.50.01, which stated the following—

Evidence has been introduced for the purpose of showing that the defendant engaged

---

[3]We presume that the jury followed these instructions. *See Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions").

in a sexual offense on one or more occasions other than that charged in this case.

Sexual offense means a crime under the laws of the state or of the United States that involve any of the following: Any conduct made criminal by the Penal Code Section 288 or 261(a)(2). The elements of these crimes are set forth elsewhere in these instructions.

If you find that the defendant committed a prior sexual offense, you may but are not required to infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may but are not required to infer that he was likely to commit and did commit the crime or crimes of which he is accused. You must not consider this evidence for any other purpose.

and CALJIC No. 2.50.1, which provided—

Within the meaning of the preceding section, the prosecution has the burden of proving by a preponderance of the evidence that a defendant committed a sexual offense other than those for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that a defendant committed the other sexual offense[s].

As indicated above, the government does not contest Mejia's argument with respect to the rape convictions; it has

conceded that *Gibson v. Ortiz* is materially indistinguishable and therefore mandates a grant of Mejia's habeas petition for the forcible rape charges. However, the parties continue to dispute, and dispute vigorously, *Gibson*'s applicability to the remaining charges.

In *Gibson*, the trial judge had allowed evidence of prior uncharged sexual offenses in the defendant's trial for the charged sexual offenses, and had read jury instructions virtually identical to those given at Mejia's trial. 387 F.3d at 817-18. We affirmed the district court's grant of the petition for a writ of habeas corpus in light of the infirm instructions. *Id.* at 814. CALJIC 2.50.1, we reasoned, ascribed a lesser burden of proof, namely, preponderance of the evidence, for previous sexual offenses. *Id.* at 822. We held that CALJIC 2.50.1's preponderance of the evidence standard, in conjunction with CALJIC 2.50.01, which permitted the jury to infer that the defendant had committed the charged crime if it found "that the defendant committed a prior sexual offense," violated the *Winship* requirement of proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. *Id.* Moreover, we concluded that, despite the general "beyond a reasonable doubt" instruction given elsewhere, the error resulting from CALJIC 2.50.1 and 2.50.01 was structural within the meaning of *Sullivan*: "When a court gives the jury instructions that allow it to convict a defendant on an impermissible legal theory, as well as a theory that meets constitutional requirements, the unconstitutionality of any of the theories requires that the conviction be set aside." *Gibson*, 387 F.3d at 825 (citation and quotation marks omitted).

Mejia argues that the structural error at play in *Gibson* and in Mejia's own rape convictions applies equally to Mejia's assault and kidnapping convictions. In support, he cites language from CALJIC 2.50.01, with emphasis on the italicized phrase: "If you find that the defendant committed a prior sexual offense, you may but are not required to infer that the defendant had a disposition to commit the same or similar

type sexual offenses. If you find that the defendant had this disposition, you may but are not required to infer that he was likely to commit and did commit *the crime or crimes of which he is accused*." CALJIC 2.50.01 (emphasis added). Mejia, in essence, argues: the italicized phrase does not specify or limit itself to "the *sexual* crime or crimes of which he is accused," thereby permitting the jury to conclude that it may find Mejia guilty of *all* of the charged crimes if it finds (by only a preponderance of the evidence) that he committed past uncharged sexual offenses. Mejia contends that this instruction thereby renders his assault and kidnapping convictions similarly in violation of *Winship* and that, under *Sullivan*, this error is structural and impervious to harmless error analysis because the misdescription of the burden of proof vitiates the jury's findings. *See Sullivan*, 508 U.S. at 281.

The government counters that this reading of the italicized phrase is "unreasonable" in the context of the surrounding text. The government contends that the instruction as a whole addresses past and current sexual offenses and the permissibility of inferring from past sexual offenses a propensity to commit sexual offenses; the government argues that the jury would have read the passage, "the crime or crimes of which he is accused," as referring only to *sexual* crimes, not the separate crimes of assault and kidnapping. The government urges application of harmless error analysis, arguing that the jury instruction is ambiguous and therefore, under *Estelle*, it violates due process only if there is a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional manner. 502 U.S. at 72.

**[2]** We agree with the government's position that CALJIC 2.50.01 is ambiguous as to what its implications were for the non-sexual offense charges. Until the phrase in italics above, CALJIC 2.50.01 explicitly limits itself to inferences permitted only with respect to sexual crimes. It states: "If you find that the defendant committed *a prior sexual offense*, you may but are not required to infer that the defendant had a disposition

to commit the *same or similar type sexual offenses*." CALJIC 2.50.01 (emphasis added). It is illogical to read the next sentence, then, to suggest that from this disposition to commit the same or similar type sexual offenses the jury may infer that the defendant "was likely to commit and did commit" non-sexual offenses. While Mejia argues that the controversial passage of CALJIC 2.50.01 could be said, when read literally, to allow convictions on *all* counts, not just the sexual offenses, based only on a preponderance of the evidence, in our view the more logical and plausible reading of the instruction is that it allows for convictions only with respect to the charged sexual offenses. That reasonable minds can differ in their reading of whether the instruction allows for conviction on the non-sexual offenses based on a burden of proof other than beyond a reasonable doubt underscores the instruction's ambiguity.[4] Our holding in *Gibson* that the instructional error there was structural with respect to the sexual offense convictions does not extend to implicate Mejia's convictions for the non-sexual offenses.

**[3]** In light of our conclusion that the contested jury instructions are ambiguous as to their implications for Mejia's non-sexual offense charges, we are left to determine "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *See Estelle*, 502 U.S. at 72 (quotation marks omitted). We may not judge the instruction in artificial isolation but must consider it in the context of the instructions and trial record as a whole. *Id*. Bearing in mind the Supreme Court's admonition that it has "defined the category of infractions that violate 'fundamental fairness' very narrowly[,]" *id*. (quoting *Dowling*

---

[4]Mejia's emphasis on the relatively interwoven nature of the sexual and non-sexual offenses in his case does not alter our analysis. The interrelatedness of the facts of the charged offenses renders it no less illogical to conclude that the jury was likely to use the belief that Mejia had a disposition to commit sexual offenses to find him guilty of assault with a deadly weapon and kidnapping.

*v. United States*, 493 U.S. 342, 352 (1990)), we hold that there is not a reasonable likelihood that the jury applied the challenged instruction in an unconstitutional way.

As we have indicated, when read in context, the most likely interpretation of the infirm jury instructions is that they allowed the impermissible inference only as to the sexual offense charges, not the remaining charges. The instructions provided that if the jury found that Mejia committed a prior sexual offense, it could infer that he had a disposition to commit the same or similar type sexual offenses. Then, if the jury found that Mejia had this disposition, it was permitted "to infer that he was likely to commit and did commit the crime or crimes of which he is accused." It would be unreasonable to conclude that, from a determination that Mejia had a disposition to commit the same or similar sexual offenses, the jury would therefore conclude that Mejia was likely to commit and therefore did commit the kidnapping and assault crimes. Our conclusion is reinforced by the facts that: 1) there was no suggestion at trial that the prior misconduct evidence should be used to prove the kidnapping and assault charges; and 2) the jury was separately instructed on the kidnapping and assault charges to find that the facts were true beyond a reasonable doubt. Moreover, in addition to rejecting two of the sexual offense charges, the jury acquitted Mejia of one of the firearm special allegations, suggesting that the jury did not use the uncharged conduct to find Mejia guilty of the non-sexual offense allegations in contravention of the *Winship* beyond a reasonable doubt requirement. We therefore hold that the infirm jury instructions did not infuse the trial with unfairness so as to deny Mejia due process of law with respect to the assault and kidnapping charges. We conclude that there is not a reasonable likelihood that the jury applied the challenged instructions in a way that violates the Constitution.

## IV

Mejia next contends that admission of Norma's testimony was impermissible propensity evidence that violated his

clearly established due process rights. Our precedent squarely forecloses this argument. In *Alberni v. McDaniel*, 458 F.3d 860 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 1834 (2007), we reviewed a post-AEDPA habeas petition in which the petitioner argued that admission of propensity evidence (in his case evidence of past violent actions in his second-degree murder case) at his trial violated clearly established due process jurisprudence. *Id.* at 862-63. We determined that admission of the propensity evidence was not contrary to clearly established law. *Id.* at 863-67. Referring to a footnote at the conclusion of the *Estelle* opinion, stating "[b]ecause we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime[,]" 502 U.S. at 75 n.5, we held that the Supreme Court had "expressly reserved consideration of the issue at hand in *Estelle*." *Alberni*, 458 F.3d at 866. Accordingly, we concluded that the state court had not acted objectively unreasonably in determining that the propensity evidence introduced against the defendant did not violate his due process. *Id.* at 866.

**[4]** Mejia can point to no Supreme Court precedent establishing that admission of propensity evidence, as here, to lend credibility to a sex victim's allegations, and thus indisputably relevant to the crimes charged, is unconstitutional. We cannot say that the California Court of Appeal decision was contrary to clearly established Supreme Court precedent.

**[5]** Mejia next suggests that admission of the propensity evidence was an unreasonable application of general due process principles, if not contrary to clearly established law. He cites *Loper v. Beto*, 405 U.S. 473 (1972), in which the Supreme Court held that the introduction of uncounseled convictions, in violation of *Gideon v. Wainwright*, 372 U.S. 335 (1963), to impeach the defendant's credibility violated due process. *Loper*, 405 U.S. at 483. Mejia invokes the following passage from *Loper*: "If the accused is forced to admit that he

has a 'record' of past convictions, particularly if they are for crimes similar to the one on trial, the danger is obvious that the jury, despite instructions, will give more heed to the past convictions as evidence that the accused is the kind of man who would commit the crime on charge, or even that he ought to be put away without too much concern with present guilt, than they will to its legitimate bearing on credibility." *Id.* at 482 n. 11.

Mejia contends that the use of an uncounseled conviction to impeach the defendant's testimony violates due process because the jurors may infer propensity and seek to punish the accused for the prior offenses. From this he infers that surely introduction of conduct for which the defendant has not even been charged should violate due process. We think that appellant places more weight on *Loper* than it can bear. The *Loper* holding was grounded in the importance of the right to counsel and the Supreme Court's desire to avoid diluting the *Gideon* holding by allowing convictions that violate *Gideon* later to prejudice a defendant. *See id.* at 481 ("To permit a conviction obtained in violation of *Gideon v. Wainwright* to be used against a person either to support guilt or enhance punishment for another offense . . . is to erode the principle of that case. Worse yet, since the defect in the prior conviction was denial of the right to counsel, the accused in effect suffers anew from the deprivation of that . . . right." (quotation omitted)).

While allowing an uncharged offense might sound more egregious than allowing an uncounseled conviction, the United States Supreme Court has never established the principle that introduction of evidence of uncharged offenses necessarily must offend due process. This case, moreover, demonstrates a key difference between the introduction of evidence of an uncounseled conviction and introduction of evidence of uncharged offenses: Mejia, unlike the *Loper* defendant, *did* have counsel to defend him against the prior allegations, and specifically to cross-examine and mount a vigorous defense against the alleged prior victim, rendering

the *Loper* principle inapposite. We reject Mejia's contention that the California Court of Appeal's decision concerning the propensity evidence was an unreasonable application of Supreme Court law.[5] The introduction of this evidence in the total context of this case did not render the trial fundamentally unfair.

In sum, the district court correctly determined that the infirm jury instructions given at Mejia's trial did not render Mejia's assault and kidnapping convictions in violation of clearly established law, and the district court correctly concluded that admission of the evidence of prior uncharged sexual offenses did not violate clearly established law concerning due process as established by the Supreme Court.

**AFFIRMED.**

---

[5]Our holding in *United States v. LeMay*, 260 F.3d 1018 (9th Cir. 2001), supports our conclusion that admission of the propensity evidence did not violate Mejia's due process rights. In *LeMay*, on direct appeal rather than collateral review, we upheld introduction of evidence under Federal Rule of Evidence 414—which is roughly analogous to California Evidence Rule 1108, allowing former acts evidence with respect to allegations of child molestation—as being consistent with due process requirements. *Id.* at 1022. We noted that the Rule 414 evidence must pass the requirements of Rules 402 and 403, *id.* at 1026-27, the federal analogs to California Evidence Rule 352 under which Norma's testimony was admitted. We reasoned that due process requires that admission of prejudicial evidence not render a trial fundamentally unfair, which Rule 402, ensuring relevance, and Rule 403, guarding against overly prejudicial evidence, together guarantee. *Id.* California Evidence Rule 352 establishes a similar threshold for the propensity evidence introduced at Mejia's trial, suggesting that under *LeMay*, Rule 352, like Federal Rules 402 and 403, safeguards due process and protected Mejia's trial from fundamental unfairness.