**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JOHN DOE,
                    *Petitioner-Appellee,*

          v.

TIMOTHY E. BUSBY, Warden,
                    *Respondent-Appellant.*

No. 08-55165

D.C. No.
CV-04-02990-AHM

JOHN DOE,
                    *Petitioner-Appellant,*

          v.

TIMOTHY E. BUSBY, Warden,
                    *Respondent-Appellee.*

No. 08-55280

D.C. No.
CV-04-02990-AHM

OPINION

Appeal from the United States District Court
for the Central District of California
A. Howard Matz, District Judge, Presiding

Argued and Submitted
June 23, 2011[1]—Pasadena, California

Filed October 24, 2011

Before: Harry Pregerson, Robert R. Beezer, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

---

[1]This case was originally argued and submitted to this court in April 2010. Following the passing of Judge David R. Thompson, Judge M. Smith was added to the panel. The case was re-argued in June 2011.

**COUNSEL**

Michael Katz, Deputy Attorney General, Los Angeles, California, for the respondent-appellant.

Alexandra Wallace Yates, Federal Public Defender, Los Angeles, California, for the petitioner-appellee.

**OPINION**

M. SMITH, Circuit Judge:

Respondent Timothy E. Busby, the warden of Ironwood State Prison in California (collectively with the state prosecution, the State), appeals the district court's order granting Petitioner John Doe a conditional writ of habeas corpus. The district court granted the writ on the ground that the California state jury which convicted Doe was improperly charged that it could find him guilty of murder and domestic violence so long as it found by a preponderance of the evidence that he had perpetrated prior unadjudicated acts of domestic violence. Following an evidentiary hearing to determine whether Doe's Petition for a Writ of Habeas Corpus (the Petition) was timely, the magistrate judge concluded that it was and further concluded that a conditional writ should issue in light of the deficient jury instructions, the 1996 versions of California Jury Instructions, Criminal (CALJIC) Nos. 2.50.02 and 2.50.1. The district court made additional findings regarding Doe's diligence in attempting to timely file the Petition, adopted the magistrate judge's recommendation, and issued a

conditional writ. The State appeals the district court's determination that the Petition was timely and the decision to grant a conditional writ. Doe cross-appeals that the district court erred by not granting habeas relief on the alternative ground that retroactive application of California Evidence Code § 1109 violated the Ex Post Facto Clause of the United States Constitution. We reject the arguments of both appeals, and affirm.

## BACKGROUND

### I.  State-Court Trial & Conviction

In an Information filed March 4, 1997, the State charged Doe with murdering his wife, Jane Roe, as well as perpetrating acts of domestic violence and making threats against Roe.[2] Count 1 of the Information charged that Doe used a firearm to commit first-degree murder of Roe on December 6, 1996, and Count 2 charged that he committed grand theft of the firearm used in the killing. The State made special allegations that Counts 1 and 2 occurred while Doe was out of custody on bail. *See* Cal. Penal Code § 12022.1. Counts 3, 4, and 5 alleged respectively that Doe committed assault and battery and made terrorist threats against Roe during an argument on October 10, 1996. Doe pled not guilty to all charges and denied the special allegations.

At a pretrial hearing on June 20, 1997, the trial court granted the State's motion to allow testimony about prior instances of domestic violence allegedly perpetrated by Doe. The trial court denied Doe's motion to sever the murder charges and domestic violence charges.

---

[2]The facts are principally drawn from the California Court of Appeal's opinion affirming Doe's conviction. The entirety of the California court's factual summary is contained in the magistrate judge's report and recommendation.

The evidence adduced at Doe's trial showed that on October 10, 1996, Roe called the police, accusing Doe of physical abuse. Doe was arrested and released on bail posted by his former girlfriend. The Los Angeles County District Attorney's Office filed spousal abuse and terrorist-threat charges against Doe. Doe was scheduled to be arraigned on these charges on December 6, 1996.

On the morning of December 6, Roe drove Doe to court for his arraignment. During the drive, Roe and Doe stopped at the former girlfriend's house so that Doe could obtain money from the former girlfriend. The California Court of Appeal summarized Doe's version of the events which culminated in Roe's death from a gunshot wound to her shoulder:

> [Roe] was driving [Doe] to court when she stopped at [the former girlfriend's] house so that [Doe] could get some money. [Doe] asked [the former girlfriend] to bring the money down, but [the former girlfriend] told [Doe] to come upstairs. [Roe] told [Doe] that she would shoot and kill him if he got out of the car. [Roe's] hand was in her purse. When [Doe] told [the former girlfriend] he was not coming upstairs, [the former girlfriend] said to send [Roe] up. [Roe] said, "I will get that bitch," then drove her car backwards through a stop sign and said to [Doe], "I know you are gonna to leave me." [Roe] accused [Doe] of having sex with [the former girlfriend], then pulled a gun out of her purse and pointed it at [Doe]. As [Doe] struggled with [Roe] for the gun, it fired. [Doe] called [the former girlfriend] because, when he tried to call 9-1-1, he got a busy signal. [Doe] maintained that he did not intend to shoot [Roe] but struggled with her for the gun to prevent [Roe] from shooting him.

Pursuant to California Evidence Code § 1109,[3] the State

---

[3]Section 1109 at the time of Doe's trial provided, *inter alia*, that "in a criminal action in which the defendant is accused of an offense involving

introduced evidence of Doe's prior unadjudicated acts of domestic violence against women. The California Court of Appeal summarized that this evidence "established that [Doe] has hit and slapped several women, including murder victim [Jane Roe]." The prosecution introduced evidence about the alleged October 10, 1996 assault by Doe against Roe that resulted in the initial charges against Doe.[4] Specifically, witnesses recounted that Roe had told the police, when obtaining a temporary restraining order against Doe, that Doe had punched her "on the face and body several times."

The former girlfriend testified that when she dated Doe, each of them had hit and slapped the other. The former girlfriend also testified that she had reported abusive behavior by Doe to the police and had obtained a restraining order against him.[5] Another of Doe's prior girlfriends testified that he had abused her during their relationship by slapping her in the face on two separate occasions. The woman testified that she also obtained a restraining order against Doe, but that they continued to have some contact with one another despite the restraining order.

domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101," Cal. Evid. Code § 1109(a) (1996), which "bars evidence of a person's character or a trait of his or her character. . . offered to prove his or her conduct on a specified occasion." Cal. Evid. Code § 1101(a).

[4]Roe testified at a preliminary hearing on the State's charges against Doe that Doe did not cause the physical injuries others observed on October 10, 1996.

[5]During Doe's trial, The former girlfriend repeatedly denied that many of the abusive incidents she had previously reported to police had occurred. The former girlfriend claimed that she was "being vindictive" when she obtained the restraining order because she was angry at Doe for ending their relationship. The State introduced testimony from a police officer that contradicted some of the former girlfriend's recantations, as the officer recalled observing the former girlfriend's injuries.

At the close of evidence, the trial court dismissed Count 4, which alleged assault with a deadly weapon during the October 10, 1996 incident, as duplicative of Count 3 concerning infliction of corporal injury to a spouse. When the trial court then instructed the jury, it gave instructions on the substantive crimes in the following order. First, the trial court instructed the jury on Count 1 for murder, Cal. Penal Code § 187, and its lesser-included offenses and other related issues. The trial court then charged the jury on Count 2 for theft by larceny, Cal. Penal Code § 487, and related issues. Then, the trial court charged Count 3 for spouse or cohabitant beating, Cal. Penal Code § 273.5, and personal use of a dangerous and deadly weapon, Cal. Penal Code § 12022(b). The trial court then read two charges from the 1996 version of CALJIC Nos. 2.50.02 and 2.50.1. Those instructions provided:

[CALJIC 2.50.02]

Evidence has been introduced for the purpose of showing that the defendant engaged in an offense involving domestic violence[6] (on one or more occasions) other than that charged in the case. . . .

. . .

If you find that the defendant committed a prior offense involving domestic violence, you may, but

---

[6]The trial court defined "domestic violence" and "abuse" as follows:

"Domestic violence" means abuse committed against an adult or a fully emancipated minor who is a spouse, former spouse, cohabitant, former cohabitant, or person with whom the defendant has had a child or is having or has had a dating or engagement relationship.

"Abuse" means intentionally or recklessly causing or attempting to cause bodily injury, or placing another person in reasonable apprehension of imminent serious bodily injury to himself or herself, or another.

are not required to, infer that the defendant had a disposition to commit the same or similar-type offenses. If you find that the defendant had this disposition, you may, but are not required, to infer that he was likely to commit and did commit the crime of which he is accused.

You must not consider this evidence for any other purpose.[7]

[CALJIC 2.50.1]

Within the meaning of the preceding instruction, the prosecution has the burden of proving by a preponderance of the evidence that [the] defendant committed the crimes other than that for which he is on trial.

You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that [the] defendant committed other crimes.

The trial court defined the preponderance standard and then read instructions relating to the lesser-included offense of Count 3 for battery, Cal. Penal Code § 243(e). The trial court read the terrorist threats charge, Cal. Penal Code § 422, and other concluding instructions not relevant for our purposes.

---

[7]In 1999, CALJIC 2.50.02 was amended to include the following additional instructions regarding reasonable doubt:

However, if you find by a preponderance of the evidence that the defendant committed a prior crime or crimes involving domestic violence, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged offense[s]. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.

CALJIC 2.50.02 (7th ed. 1999).

The jury convicted Doe on Count 1 for first degree murder, Count 3 for committing corporal injury to a spouse, and Count 5 for making terrorist threats. The jury acquitted Doe on Count 2 for grand theft of the firearm that killed Roe. Doe was sentenced to a term of thirty-one years to life imprisonment.[8] The California Court of Appeal affirmed his conviction and sentence on March 24, 1999. The California Supreme Court denied Doe's petition for review on June 24, 1999.[9]

## II. Post-Conviction Collateral Proceedings

Although Doe's state conviction became final in September 1999, *see* Sup. Ct. R. 13.1, Doe did not file the instant federal Petition until April 28, 2004. The *pro se* Petition was referred to Magistrate Judge Walsh. The State moved to dismiss the petition as untimely under the one-year limitations period established by the Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2244(d). The magistrate judge recognized Doe might be entitled to tolling and appointed Doe counsel before convening an evidentiary hearing on the timeliness of the Petition.

In an Order dated February 1, 2005, the magistrate judge determined that Doe was entitled to equitable tolling on his Petition and denied the State's motion to dismiss. The magistrate judge summarized the events which delayed the filing:

> [I]n July 1999, [Doe] paid $20,000 to an attorney to file a petition for writ of habeas corpus on [Doe's] behalf in [the District] Court. Unbeknownst to

---

[8]The sentence consisted of a term of 25 years to life for the murder offense, plus an additional six years for the two enhancements of personally using a firearm and committing the offense while on bail. On Counts 3 and 5, Doe was sentenced to determinate five-year terms to run concurrently with the sentence on Count 1.

[9]The California Supreme Court denied Doe's petitions for review and for habeas corpus without issuing a written opinion.

[Doe], the lawyer had never filed a federal petition before and did not know that there was a one-year statute of limitations governing the filing of a petition. Surprisingly, however, [Doe] knew of the deadline and, beginning in 1999, began writing to his counsel to encourage him to file a petition on time, *i.e.*, by September 2000. [Doe] also spoke with his counsel and with his counsel's paralegal on the telephone. Despite [Doe's] efforts, his counsel missed the filing deadline.

[Doe] wrote to counsel immediately after learning that he had not filed a petition on time and asked what he intended to do about it. Counsel and his paralegal convinced [Doe] that there was a way around the statute of limitations if they were able to uncover new evidence, which they intended to do.

Meanwhile, [Doe] filed a disciplinary complaint with the California State Bar Association against his counsel. Thereafter, counsel's paralegal visited [Doe] in jail at counsel's behest and convinced [Doe] that, if he dropped the disciplinary action, she and [Doe's] counsel would vigorously pursue [Doe's] case and find a way around the statute of limitations. She informed him that, if he did not drop it, they would no longer work on his case because it would be a conflict of interest. [Doe] agreed and dropped the bar complaint.

Throughout 2001, 2002, and 2003, [Doe] continually pleaded with counsel to file a petition for him, but to no avail. Finally, in October 2003, [Doe's] counsel wrote [Doe] and told him he would no longer represent him. [Doe] subsequently requested that counsel return his files, which counsel did not do until April 2004. Ten days later, [Doe] filed the instant Petition.

Excerpts of Record at 36-37. The magistrate judge reasoned that the statute of limitations should be equitably tolled because Doe had exercised "reasonable diligence" in the face of "sufficiently egregious" attorney misconduct.

On May 25, 2007, the magistrate judge issued a Report and Recommendation that the Petition be granted because the state trial court's combined use of CALJIC Nos. 2.50.02 and 2.50.1 had, per our holding in *Gibson v. Ortiz*, 387 F.3d 812 (9th Cir. 2004), unconstitutionally "lessened the prosecutor's burden of proof," making those instructions "contrary to clearly established federal law." The magistrate judge recommended denying the State's procedural default arguments as well as Doe's other grounds for relief based on purported due process, ex post facto, Confrontation Clause, equal protection, and prosecutorial misconduct violations.

The district court adopted the Report and Recommendation and granted Doe's Petition. With respect to equitable tolling, the district court held that the reasons for delay were "extraordinary" and stated, "[a] three-and-a-half year delay is indeed lengthy. But it was largely attributable to [Doe] having been deceived, bullied and lulled by an apparently inept and unethical lawyer."

The State and Doe timely cross-appeal the district court's Order.

## JURISDICTION & STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. §§ 1291 and 2253.

Doe filed his Petition after AEDPA's effective date, and thus AEDPA applies here. *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Under AEDPA, a federal court may not grant a habeas corpus petition unless the last reasoned state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined

by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established federal law if it applies a rule that contradicts Supreme Court case law or if it reaches a conclusion different from the Supreme Court's decision in a case involving materially indistinguishable facts. *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003). A state court decision is an "unreasonable application of" clearly established federal law if the state court identified the correct governing legal rule but unreasonably applied it to the facts at hand. *Williams v. Taylor*, 529 U.S. 362, 407-08 (2000). "Clearly established Federal law" refers to the holdings of the Supreme Court at "the time of the relevant state-court decision." *Id*. at 412.

We conduct a de novo review of the district court's issuance of a writ of habeas corpus under 28 U.S.C. § 2254. *Christian v. Frank*, 595 F.3d 1076, 1080 (9th Cir.), *cert denied*, 131 S. Ct. 511 (2010). When "the facts underlying a claim for equitable tolling are undisputed, the question whether the statute of limitations should be equitably tolled is also reviewed de novo." *Spitsyn v. Moore*, 345 F.3d 796, 799 (9th Cir. 2003).

## DISCUSSION

There are three distinct issues in these appeals. The position advanced by the State is as follows. First, Doe's Petition, filed more than four years after his state conviction became final, was untimely under AEDPA. Doe is not entitled to equitable tolling because although his attorney was "incompetent," Doe himself did not exercise reasonable diligence, and he acted unreasonably in relying on an attorney whose performance he knew was substandard. Thus the district court erred in denying the State's motion to dismiss the Petition. Second, even assuming the Petition is deemed timely, there was no error in the state court's jury instructions. The instructions did not

misrepresent or lower the burden of proof, because the prosecutor and defense repeatedly emphasized the reasonable doubt standard, and intervening case law holds that even if there were error, it is harmless.

On cross-appeal, Doe argues that the district court erred by not granting habeas relief on the alternative ground that retroactive application of California Evidence Code § 1109 violated the Ex Post Facto Clause.

We address and reject each of the preceding arguments in turn.

## I. Equitable Tolling of the Petition

**[1]** Under AEDPA, a prisoner in state custody must file a federal habeas petition within one year from the conclusion of direct review of the criminal conviction. 28 U.S.C. § 2244(d); *Roy v. Lampert*, 465 F.3d 964, 968 (9th Cir. 2006). The AEDPA limitations period may be tolled when state post-conviction remedies are pending, *see* 28 U.S.C. § 2244(d)(2), and when it is equitably required. *Holland v. Florida*, 130 S. Ct. 2549, 2560 (2010); *see also Spitsyn v. Moore*, 345 F.3d 796, 799-802 (9th Cir. 2003). Where, as here, equitable tolling is sought, a petitioner seeking tolling bears the burden of showing (1) that he diligently pursued his rights and (2) that an extraordinary circumstance prevented a timely filing. *Holland*, 130 S. Ct. at 2562; *Spitsyn*, 345 F.3d at 799 (citing *Stillman v. LaMarque*, 319 F.3d 1199, 1203 (9th Cir. 2003)). Like any equitable consideration, whether a prisoner is entitled to equitable tolling under AEDPA will depend on a fact-specific inquiry by the habeas court which may be guided by "decisions made in other similar cases." *Holland*, 130 S. Ct. at 2563; *see also Spitsyn*, 345 F.3d at 799; *Whalem/Hunt v. Early*, 233 F.3d 1146, 1148 (9th Cir. 2000) (en banc) (per curiam) (rejecting argument that lack of access to library materials categorically requires tolling).

**[2]** Doe seeks equitable relief on account of his former attorney's misconduct, primarily in failing to file a petition after misleading Doe to believe a filing would occur. Equitable tolling may be warranted in instances of unprofessional attorney behavior; however, the AEDPA deadline will not be tolled for a garden variety claim of excusable attorney neglect or mistake. *See Spitsyn*, 345 F.3d at 800-02; *see also Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) ("[T]he principles of equitable tolling described above do not extend to what is at best a garden variety claim of excusable neglect."). Thus, in cases where a petitioner claims his attorney was the cause of the untimeliness, courts must examine if the claimed failure was one of mere *negligence* by the attorney, such as inadvertently miscalculating a filing deadline in a non-capital case, *see Frye v. Hickman*, 273 F.3d 1144, 1146 (9th Cir. 2001), or a *sufficiently egregious* misdeed like malfeasance or failing to fulfill a basic duty of client representation, *see Spitsyn*, 345 F.3d at 801 (citing *Baldayaque v. United States*, 338 F.3d 145, 152 (2d Cir. 2003)).

The State does not seriously contest that "extraordinary circumstances" prevented a timely filing of the Petition; the State's papers describe Doe's former attorney, among other things, as "incompetent" and having "utterly fail[ed] him." Appellant's Opening Br. at 36, 38; Appellant's Third Br. on Cross-Appeal at 5. The State, along with the magistrate judge and district court, are correct to have observed that the services rendered by Doe's former counsel were utterly deficient and unprofessional and thus constituted an extraordinary circumstance preventing the timely filing of this Petition.

**[3]** Doe hired his former counsel to file a federal habeas petition more than one year prior to the AEDPA deadline, and paid him a handsome $20,000 advance for this service. Doe provided that counsel with his files and repeatedly made inquires on the progress of his case. Not only did the attorney not file a timely habeas petition, he filed no petition at all, in spite of his numerous promises to the contrary. When Doe

eventually sought his files from the attorney, the attorney took six months to return them. These circumstances are far more egregious than those we encountered in *Spitsyn v. Moore*, where we found tolling could be justified when a petitioner thrice contacted his counsel but received no responses and filed two grievances with the state bar association. The counsel then terminated the representation two weeks prior to the habeas deadline and returned the petitioner's files two months after the deadline lapsed. 345 F.3d at 800-01; *see also Baldayaque*, 338 F.3d at 152 (finding equitable tolling may be justified where an attorney "failed to file . . . a petition at all" despite being specifically directed by his client to do so); *Nara v. Frank*, 264 F.3d 310, 320 (3d Cir. 2001) (finding equitable tolling could be shown if evidence supported allegations that attorney informed petitioner that "she was going to file the federal habeas petition . . . and that there were no time constraints for filing"), *overruled in part on other grounds by Carey v. Saffold*, 536 U.S. 214 (2002) *as recognized by Laws v. Lamarque*, 351 F.3d 919, 924 (9th Cir. 2003).

Whether Doe remained diligent in the face of the above-described failures by his former attorney is, as the magistrate judge noted, "less clear" than the relatively obvious point that Doe faced an extraordinary impediment. The diligence required for equitable tolling is "reasonable diligence," not "maximum feasible diligence." *Holland*, 130 S. Ct. at 2565 (internal quotation marks omitted); *see also Baldayaque*, 338 F.3d at 153 ("The standard is not 'extreme diligence' or 'exceptional diligence,' it is *reasonable* diligence."). The purpose of requiring a habeas petitioner to show diligence is to verify that it was the extraordinary circumstance, as opposed to some act of the petitioner's own doing, which caused the failure to timely file. *See Roy*, 465 F.3d at 973; *Spitsyn*, 345 F.3d at 802.

**[4]** To determine if a petitioner has been diligent in pursuing his petition, courts consider the petitioner's overall level of care and caution in light of his or her particular circum-

stances. *See Roy*, 465 F.3d at 972 ("In addition to the specific efforts [petitioners] allege that they made to pursue their claims, we also consider it important that [petitioners] pursued their claims within a reasonable period of time *before* the external impediment . . . came into existence."); *Baldayaque*, 338 F.3d at 153 ("[T]he district court should ask: did the petitioner act as diligently as reasonably could have been expected *under the circumstances?*"). In a case such as this, where attorney misconduct is the claimed circumstance causing the untimeliness, courts consider, *inter alia*, whether the petitioner expeditiously secured counsel to file the habeas petition, *see Baldayaque*, 338 F.3d at 153, the frequency and nature of the attorney-client communications, *see Spitsyn*, 345 F.3d at 801, when, in light of the petitioner's education and background, he reasonably should have sought new counsel, *Baldayaque*, 338 F.3d at 153, and whether the petitioner had the means to consult alternate counsel, *id.*

The gravamen of the State's argument is that Doe was aware, or should have been aware, that his counsel was "incompetent." Appellant's Opening Br. at 38. The State says Doe had an independent, personal, and non-delegable duty to discover the reality of his attorney's substandard representation, and that no later than September 2000 should Doe have realized that his counsel was "obviously unreliable." Appellant's Opening Br. at 41-42. As noted *supra*, the State repeatedly emphasizes Doe's counsel's deficient performance to buttress its argument that Doe lacked diligence in discovering his attorney's failings, and thus the statute of limitations should run. We disagree with the State's argument, and uphold the district court's equitable tolling decision.

[5] The State's overzealous use of hindsight seeks to push the diligence required for tolling well outside the realm of "reasonable." As the district court detailed, the facts in the record show Doe "displayed unusual, albeit misguided, tenacity in trying to file a petition" after "having been deceived, bullied and lulled by an apparently inept and unethical law-

yer." Doe retained his counsel, at a price of $20,000, more than one year before his habeas petition was due to be filed. *See United States v. Martin*, 408 F.3d 1089, 1095 (8th Cir. 2005) ("[Petitioner] hired [his attorney] well in advance of his filing deadline."). Doe wrote numerous letters and made scores of phone calls from prison to remind his attorney of the deadline, and received assurances from the attorney that the petition would be filed. *See Dillon v. Conway*, 642 F.3d 358, 364 (2d Cir. 2011) (per curiam) ("[The attorney] in effect admitted affirmatively and knowingly *misleading* [petitioner] by promising him that he would file the petition before November 30, 2007 . . . [and] breached that promise when he failed to follow his client's instruction, with disastrous consequences that [petitioner] could neither have foreseen nor prevented."); *Martin*, 408 F.3d at 1095 ("[Petitioner] and his wife did everything in their power to stay abreast of the status of his case, and provided [the attorney] with original documents to assist in the matter."). Frustrated by inaction, Doe pursued grievances with state authorities. *See Martin*, 408 F.3d at 1095 ("[Petitioner] filed a complaint with the California Bar."). When the deadline passed in early 2001, with his state grievances against his attorney pending, he was cajoled by that attorney to abandon the ethics complaints and wrongly informed that new evidence was necessary prior to filing the petition, but that the search for such evidence was ongoing. Untrained in the technicalities of habeas law and incarcerated, Doe was in no position to question a plausible explanation for the attorney's delay or to observe the thoroughness of the attorney's supposedly ongoing investigation for evidence. Reasonable diligence does not require a petitioner to identify the legal errors in his attorney's advice and thereupon fire the attorney because such errors would have been evident to a trained lawyer, nor does it require a petitioner to proceed *pro se* without an obvious reason for doing so. *See Brown v. Roe*, 279 F.3d 742, 745 (9th Cir. 2002). Moreover, Doe, having already turned over $20,000 and the case materials to the attorney, was hardly in the position to proceed *pro se*. In *Spit-*

*syn*, we rejected an argument that the petitioner represented by deficient counsel was obligated to retain another attorney to timely file a habeas petition. *See* 345 F.3d at 801. We might further observe that adopting the State's position and requiring a represented petitioner to proceed on a dual track with his own petition could pose other technical and procedural hurdles for incarcerated prisoners. *See*, *e.g.*, *Downs v. McNeil*, 520 F.3d 1311, 1324 n.10 (11th Cir. 2008) (noting practice of district court to "routinely strike[ ] and return[ ] pro se filings of parties who are represented by counsel, which means that 'even a savvy petitioner, who may see the clock running out on his habeas time, can only cajole [or] plead with his counsel to file the petition timely' " (quoting *Thomas v. McDonough*, 452 F. Supp. 2d 1203, 1206-07 (M.D. Fla. 2006)).

Nor can we identify any analysis in the numerous cases cited to us by the State which might explain why Doe should be held to account for his attorney's affirmative misrepresentations. Appellant's Opening Br. at 42-46 (citing, *inter alia*, *Schlueter v. Varner*, 384 F.3d 69, 76-78 (3d Cir. 2004); *Beery v. Ault*, 312 F.3d 948, 951-52 (8th Cir. 2002); *Celaj v. Artuz*, 49 F. App'x 331, 332-33 (2d Cir. 2002) (unpublished); *Loving v. Mahaffey*, 27 F. App'x 925, 925 (10th Cir. 2001) (unpublished)). The State's strongest argument comes from *Schlueter v. Varner*, where the Third Circuit held that equitable tolling was not available for a petitioner who claimed attorney misconduct when his attorney, despite representations to the contrary, missed a filing deadline for state-court collateral relief, which necessarily impacted tolling under AEDPA, 28 U.S.C. § 2244(d)(2). *Schlueter,* 384 F.3d at 76-77. The Third Circuit reasoned that the petitioner could have learned his attorney had not filed the state-court petition by the date he had promised, and the petitioner could have filed himself for state collateral relief. *Id.* at 76. Unlike *Schlueter*, Doe is not seeking federal tolling based on bad legal advice in another proceeding—the claim of misconduct arises in the timely filing of *this* federal petition. *See Holland*, 130 S. Ct. at 2563

(distinguishing between tolling due to untimely state filings which implicates federalism concerns and tolling untimely federal filings). Moreover, *Schlueter* did not involve an attorney affirmatively misrepresenting the status of a case to assuage his doubting client; indeed, the Third Circuit acknowledged its prior holding that "[an] attorney's affirmative misrepresentation to his client coupled with the plaintiff's extreme diligence in pursuing her claim . . . 'created a situation appropriate for tolling.' " *Schlueter*, 384 F.3d at 76 (quoting *Seitzinger v. Reading Hosp. & Med. Ctr.*, 165 F.3d 236, 242 (3d Cir. 1999)).[10]

The State makes too much of the solitary fact that it took three years for the Petition to be filed after the deadline had passed. The State says that we would not hesitate to find a lack of diligence where a petitioner "waited another twenty years to file a *pro se* petition," Appellant's Third Br. on Cross-Appeal, at 4, nor would we condone a ten year, seven year, or five year wait. But untimeliness alone does nothing to resolve an issue of equitable tolling; the court must adduce the reasons for the delay regardless of the length. AEDPA sets a statute of limitations not a period of repose, *Holland*, 130 S. Ct. at 2560-61, and the passage of time alone is not determinative. While we do not doubt that tolling a case for twenty years would be difficult to justify, because AEDPA "does not set forth an inflexible rule requiring dismissal whenever its clock has run," *Holland*, 130 S. Ct. at 2560 (internal quotation marks omitted), we cannot say the circumstance will never arise. Equitable tolling is not the arena of bright-lines and dates certain; "determinations . . . whether there are grounds

---

[10]The State also points to *Beery v. Ault*, 312 F.3d at 948, in support of its diligence argument. Not only does *Beery* concern a claim of attorney error in a state-court post-conviction proceeding, the case involves whether the misconduct met the "extraordinary circumstances" prong of tolling: "[W]e conclude no extraordinary circumstance beyond Beery's control prevented him from filing a timely habeas petition." *Id.* at 952. The case is inapposite.

for equitable tolling are highly fact-dependent." *Whalem/Hunt*, 233 F.3d at 1148.

**[6]** The standard for reasonable diligence does not require an overzealous or extreme pursuit of any and every avenue of relief. It requires the effort that a reasonable person might be expected to deliver under his or her particular circumstances. We conclude that a reasonable litigant in Doe's situation who is represented by experienced counsel, if asked about the status of his or her lawsuit, would be justified in replying, "My lawyer is handling it." *Cf. Martin*, 408 F.3d at 1095 ("We will not fault Martin for relying on his attorney here."); *see also* Cal. R. Prof. Conduct 3-110(A) ("A member shall not intentionally, recklessly, or repeatedly fail to perform legal services with competence."). Even had Doe known his attorney had not handled a habeas petition before, his reliance would still have been reasonable. *See* Cal. R. Prof. Conduct 3-110(C) ("If a member does not have sufficient learning and skill when the legal service is undertaken, the member may nonetheless perform such services competently by 1) associating with or, where appropriate, professionally consulting another lawyer reasonably believed to be competent, or 2) by acquiring sufficient learning and skill before performance is required."). When Doe's attorney finally informed him that *no* petition was forthcoming after four years of representations to the contrary and then delayed six months in returning Doe's files, Doe managed to file this Petition in ten days. We agree with the district court that Doe did not relent in his efforts and that he is entitled to equitable tolling for his diligence in the face of his counsel's deceit. Therefore, we turn to the merits of Doe's Petition.

## II. Jury Instructions on Unadjudicated Acts of Domestic Violence

**[7]** In a criminal trial, whether at the state or federal level, "[t]he prosecution bears the burden of proving all elements of the offense charged, and must persuade the factfinder 'beyond

a reasonable doubt' of the facts necessary to establish each of those elements." *Sullivan v. Louisiana*, 508 U.S. 275, 277-78 (1993) (citations omitted); *In re Winship*, 397 U.S. 358, 363-64 (1970) ("The reasonable-doubt standard plays a vital role in the American scheme of criminal procedure. It is a prime instrument for reducing the risk of convictions resting on factual error. The standard provides concrete substance for the presumption of innocence—that bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law." (internal quotation marks omitted)).

**[8]** *Sullivan* provides that "the essential connection to a 'beyond a reasonable doubt' factual finding cannot be made where the instructional error consists of a misdescription of the burden of proof, which vitiates *all* the jury's findings." 508 U.S. at 281. The Court in *Sullivan* also engages in a useful discussion of structural versus harmless errors. *Id.* at 278-82. The Court cites to *Arizona v. Fulminante*, 499 U.S. 279, 308-10 (1991), which discusses the distinction between potentially harmless "trial errors," and never-harmless "structural errors." Trial errors are problems which occur during a case's presentation to the trier of fact and may be assessed in the context of other evidence. They may be harmless and are harmless if the error can be examined against the other trial evidence and a determination made that the error was not serious enough that it would have caused the jury to have a reasonable doubt of the defendant's guilt. *See id.* at 310. In contrast, structural errors are "violations . . . in the constitution of the trial mechanism," and are "defect[s] affecting the framework within which the trial proceeds" which inhibit the trial's " 'function as a vehicle for determination of guilt or innocence.' " *Id.* at 309-10 (quoting *Rose v. Clark*, 478 U.S. 570, 578 (1986)). They are never harmless.

**[9]** In *Gibson v. Ortiz*, we held that the CALJIC instructions identical in all relevant respects to those given at Doe's trial violated due process and their use was contrary to clearly

established federal law under AEDPA. 387 F.3d at 817 n.4 ("The jury also received CALJIC No. 2.50.02, which is identical in all aspects to No. 2.50.01, except that it addresses prior acts of domestic violence."). In *Gibson*, the State had presented at trial "evidence of the prior uncharged sexual assaults that [Gibson] committed . . . under Cal. Evid. Code § 1108, which allows such evidence to be introduced as long as its probative value is not substantially outweighed by its prejudicial value." *Id.* at 817. The trial court read the 1996 CALJIC instructions, and the jury convicted Gibson. *Id.* at 817-18. In affirming the district court's grant of a conditional habeas writ, we explained that "the interplay of the two instructions allowed the jury to find that Gibson committed the uncharged . . . offenses by a preponderance of the evidence and thus to infer that he had committed the *charged* acts based upon facts found not beyond a reasonable doubt, but by a preponderance of the evidence." *Id.* at 822. Because the instructions on the burden of proof are not ambiguous, *id.* at 822 n.8, "[t]he 1996 version of CALJIC No. 2.50.01 runs directly contrary to *Winship*'s maxim that a defendant may not be convicted except 'upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.' " *Id.* at 822 (quoting *In re Winship*, 397 U.S. at 364).

[10] We further held in *Gibson* that by "permitt[ing] the jury to find Gibson guilty of the charged sexual offenses by merely a preponderance of the evidence," the use of the jury instruction "constituted structural error within the meaning of *Sullivan* [*v. Louisiana*]." *Id.* at 824. We explained the connection to *Sullivan:*

> In *Sullivan*, the trial court gave the jury a definition of reasonable doubt that had previously been held unconstitutional in *Cage v. Louisiana*, 498 U.S. 39 (1990). In invalidating Sullivan's conviction because of the unconstitutional standard of proof, the Supreme Court tied the Fifth Amendment require-

> ment of proof beyond a reasonable doubt to the Sixth Amendment right to a jury trial, holding that "the jury verdict required by the Sixth Amendment is a jury verdict of guilty beyond a reasonable doubt." A *Sullivan* error precludes harmless error review because no verdict within the meaning of the Sixth Amendment has been rendered.

*Gibson*, 387 F.3d at 824-25 (citations and emphasis omitted). We also held that the reading of "at least one correct reasonable doubt instruction (CALJIC No. 2.01) and [an instruction] on the presumption of innocence (CALJIC No. 2.90)" were not enough to "remove[ ] the use of CALJIC No. 2.50.01 from the realm of constitutional error." *Id.* at 825.

Doe's Petition follows *Gibson* and asserts that his trial was constitutionally infirm because the trial court's use of the 1996 CALJIC Nos. 2.50.02 and 2.50.1 allowed the jury to convict him of, among other things, first degree murder if it found by a mere preponderance of evidence that certain acts of domestic violence occurred. The district court granted Doe's Petition in light of our precedent in *Gibson* that reading the prior versions of CALJIC Nos. 2.50.02 and 2.50.1 violates an accused's due process rights. The State argues that the district court erred because intervening case law blunts *Gibson*'s holding, and indeed supersedes it. Specifically, the State argues that the Court's decision in *Hedgpeth v. Pulido*, 555 U.S. 57 (2008) (per curiam), and our decisions in *Mendez v. Knowles*, 556 F.3d 757 (9th Cir. 2009), and *Byrd v. Lewis*, 566 F.3d 855 (9th Cir. 2009), require us to apply harmless error review, as opposed to deeming the reading of the instructions as structural error. Viewed in context, the State argues that because "both the prosecutor and the defense attorney repeatedly stressed in all three closing arguments that the burden of proof was beyond a reasonable doubt," Appellant's Opening Br. at 47, a *Gibson* error did not occur.

Absent the attorney misconduct catalogued above, Doe's Petition would likely have come to us several years ago, and

we would have routinely granted his writ for the *Gibson* due process violation. *See, e.g.*, *Mackey v. Newland*, 212 F. App'x 656, 657 (9th Cir. 2006) (granting habeas relief for *Gibson* error); *Griffey v. Hubbard*, 176 F. App'x. 759, 759 (9th Cir. 2006) (same); *Miler v. Butler*, 155 F. App'x 377, 378 (9th Cir. 2005) (same); *Lea v. Alameida*, 153 F. App'x. 990, 991 (9th Cir. 2005) (same); *see also Mejia v. Garcia*, 534 F.3d 1036, 1043 (9th Cir. 2008) ("[T]he government *does not contest* [petitioner's] argument with respect to the rape convictions; it has conceded that *Gibson v. Ortiz* is materially indistinguishable and therefore mandates a grant of [petitioner's] habeas petition for the forcible rape charges." (emphasis added)). We would have granted the Petition because the deficiencies we highlighted in *Gibson* are equally present at Doe's trial.

A habeas court must presume that jurors follow the jury instructions. *Fields v. Brown*, 503 F.3d 755, 782 (9th Cir. 2007) (en banc); *Gibson*, 387 F.3d at 822 ("We presume that the jury followed these instructions and proceeded on the basis that if it found Gibson had committed prior sexual offenses, it was then permitted to infer that Gibson had committed the charged offenses." (citation omitted)). "Any challenged instruction must be considered in light of the full set of jury instructions and the trial record as a whole." *Gibson*, 387 F.3d at 821 (citing *Cupp v. Naughten*, 414 U.S. 141, 146-47 (1973)). This is because "isolated statements taken from the charge" may seemingly be prejudicial but in fact "are not so when considered in the context of the entire record of the trial." *United States v. Silla*, 555 F.2d 703, 706 (9th Cir. 1977) (quoting *United States v. Park*, 421 U.S. 658, 674-75 (1975)) (quotation marks omitted). Although CALJIC Nos. 2.50.02 and 2.50.1 were read by the trial court during its instructions on Count 3, concerning domestic violence, the State then made statements to the jury during closing argument so it would not limit its use of the preponderance instruction to only Count 3; after being admonished by the

trial court to focus her closing argument on the evidence in the case, the prosecutor told the jurors:

> As I left off, what this is all about is a murder sui-cide. That was the Defendant's intention all along, that premeditation and deliberation started early on.
>
> It actually started in the beginning of the relation-ship, because there is an instruction that you will be hearing, that if you believe the domestic violence assaults in the past occurred not only between the Defendant and [Jane Doe] but between the Defen-dant and all of his women . . . that you can then infer that the domestic violence that he committed this time, in fact, he had a disposition to do so.
>
> *So you can use that for all counts*. You can use that for the counts of the domestic violence in Octo-ber. That's Count 3, the spousal battery with the per-sonal use of the knife, and you can use it for the homicide, because the homicide, the murder, is another act of domestic violence. It is the final act of domestic violence.

Excerpts of Record at 637-38 (emphasis added). The use of the preponderance instruction, with the prosecutor's statement that it could cover more than Count 3, was not tangential or insignificant in light of the overall instructions. *See United States v. Mapelli*, 971 F.2d 284, 287 (9th Cir. 1992) ("We cannot find harmless error in the deliberate ignorance instruc-tion. . . . The prosecutor read the deliberate ignorance instruc-tion in his closing argument, using it effectively to assist the jury in evaluating the mental element.").

**[11]** Because *Doe* is clearly entitled to relief under *Gibson* if that case remains good law in our circuit, we turn to the seemingly more difficult question of whether it remains good

law given the intervening cases of *Pulido*, 555 U.S. 57, *Mendez*, 556 F.3d 757, and *Byrd*, 566 F.3d 855.

In *Hedgpeth v. Pulido*, the Supreme Court held that where a jury is instructed on multiple theories of guilt[11] and one theory is legally incorrect, that erroneous jury instruction is not "structural," and instead must be analyzed under the harmless error standard to determine whether "the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.' " 555 U.S. at 58 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)). In *Pulido*, the Court reiterated its rule from *Neder v. United States*, 527 U.S. 1 (1999), that "harmless-error analysis applies to instructional errors so long as the error at issue does not categorically 'vitiat[e] all the jury's findings.' " *Pulido*, 555 U.S. at 61 (quoting *Neder*, 527 U.S. at 11). "An instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted." *Id.*

We first addressed the import of *Pulido* in a case involving CALJIC 2.50.1 in *Mendez v. Knowles*, 556 F.3d at 757. There, the petitioner sought habeas on the same ground on which it was granted in *Gibson*. We denied habeas because the prior bad acts *were criminal offenses* proven beyond a reasonable doubt (through guilty pleas). *Id.* at 769-70. *Mendez* acknowledged *Gibson*'s holding: "When a jury instruction is erroneous because it misdescribes the burden of proof, it 'vitiates *all* the jury's findings,' and no verdict within the meaning of the Sixth Amendment is rendered. 'Where such an error exists, it is considered structural and thus is not subject to

---

[11]"Pulido sought to vacate his conviction on the ground that the jury instructions were erroneous: They permitted the jury to find him guilty of felony murder if he formed the intent to aid and abet the underlying felony before the murder, but they also permitted the jury to find him guilty if he formed that intent only after the murder." *Pulido*, 555 U.S. at 59.

harmless error review.' " *Id.* at 768 (quoting *Sullivan*, 508 U.S. at 281; *Gibson*, 387 F.3d at 820). *Mendez* highlighted that in *Gibson* we had opined that CALJIC 2.50.01, which permitted the jury to infer that Gibson committed the charged crimes if it concluded that he had committed the prior sexual offenses, was constitutionally valid standing alone. *Id.* at 769. "Thus, so far as our *Gibson* precedent is concerned, it was constitutionally valid for the jury to infer that Gibson committed the charged crime based on the previous . . . uncharged sexual offenses so long as those previous offenses were proven beyond a reasonable doubt." *Id.* We described our concern in *Gibson* as "the interplay of CALJIC 2.50.01 and 2.50.1." *Id.* (alterations omitted) (quoting *Gibson*, 387 F.3d at 822). We accepted as valid the distinction that "because the prosecution proved beyond a reasonable doubt that Mendez had been convicted of at least one of the prior sexual offenses, the jury could not have convicted Mendez of the charged offenses on anything less than proof beyond a reasonable doubt." *Id.* We then stated that we were "comfortable that the jury did not rely upon an incorrect burden of proof in convicting Mendez. Mendez's jury specifically found beyond a reasonable doubt that Mendez had been convicted of one of the two prior sexual offenses. Because the jury made this specific finding, it necessarily did not find that Mendez committed the prior sexual offense by a preponderance of the evidence." *Id.* at 769-70.[12]

---

[12]Despite our acknowledgment of *Gibson* as structural error, in *Mendez*, we gave further reasons for its holding which appear to apply to some degree a quasi-harmless-error standard:

> Additional differences between Mendez's case and *Gibson* buttress our conclusion that the jury did not convict Mendez based on a constitutionally deficient burden of proof. First, in Mendez's case, several instructions regarding the beyond a reasonable doubt standard were read to the jury after the jury was given the preponderance of the evidence instruction; whereas in *Gibson*, once the preponderance of the evidence standard was read to the jury, the beyond a reasonable doubt standard was not included in any subsequent instructions. Second, the prosecutor in Mendez's case, unlike the prosecutor in *Gibson*, did not dis-

Several months after we issued *Mendez*, we decided *Byrd v. Lewis*, 566 F.3d at 855. *Byrd* involved none of the California jury instructions at issue in *Gibson*, *Mendez*, or here. Rather, the petitioner in *Byrd* sought habeas relief for an automobile theft conviction. *Id.* at 858-59. One of Byrd's challenges was to the trial court's scope-of-consent instruction, which provided:

> The failure to return a vehicle that was obtained by consent in a timely manner does not by itself establish a violation of section 10851. . . . You should determine from the circumstances whether the continued use of a vehicle both as to the length of time and the manner clearly and substantially exceeded the scope of the consent given. If it does not clearly and substantially exceed the scope of the consent given, then the required criminal intent would not be clearly established.

*Id.* at 861 (emphasis omitted). Byrd argued that "[t]his instruction diluted the prosecution's burden of proof, thereby violating his right to due process." *Id.* The California Court of Appeal had reasoned that "because a 'clearly established' standard was applied to define the requisite criminal intent, 'it is reasonably likely the jury did not find that [Byrd] exceeded [the owner's] scope of consent beyond a reasonable doubt,' "

---

cuss, much less emphasize, the preponderance of the evidence standard in her closing argument. Third, the victim of Gibson's prior sexual offenses and the charged offense was the same, whereas Mendez's prior sexual offenses involved different victims than those involved in his charged offenses. We conclude that no rational juror would have understood the instructions on evidence of prior sexual misconduct to relieve the jury of its duty to find beyond a reasonable doubt that Mendez had committed the charged offenses. We therefore uphold Mendez's convictions as constitutionally sound.

*Id.* at 770.

but nevertheless concluded the error was ultimately harmless. *Id.* (quoting *People v. Byrd*, No. C034582, 2001 WL 1480516, at *10 (Cal. Ct. App. Nov. 21, 2001)). Thus, we were presented with the question of whether the California court's use of a harmless error standard was an unreasonable application of Supreme Court precedent under AEDPA. *Id.* at 861-64.

After chronicling a number of Supreme Court cases, including *Sullivan* and *Pulido*, we concluded that it was not an unreasonable application of Supreme Court law. *Id.* at 862-64. We continued: "We recognize that our decision in *Gibson* reaches a different outcome." *Id.* at 865. After describing the facts in *Gibson*, we stated:

> In granting relief to Gibson, we concluded that the instructions addressing the prior uncharged acts impermissibly lowered the burden of proof "for the permissive inference" to be drawn from the uncharged acts. We held that the error was structural because the instructions "permitted the jury to find Gibson guilty of the charged sexual offenses by merely a preponderance of the evidence . . ." Further, we found this to be clearly established constitutional law.

> However, *Pulido* instructs that "[a]n instructional error arising in the context of multiple theories of guilt" does not vitiate all the jury's findings. The jury could have convicted Gibson on the theory that the inference from the prior uncharged acts warranted a finding of guilt, or it could have convicted Gibson on the theory that the direct testimony of the victim regarding the charged offenses warranted a finding of guilt, or on some combination of the two theories. . . .

> Although we are reluctant to do so, we must overrule *Gibson* to the extent that it applies structural

error review to an instructional error that affects only an element of the offense, a permissible evidentiary inference, or a potential theory of conviction, as opposed to an instructional error that affects the overarching reasonable doubt standard of proof.

*Id.* at 865-66 (citations omitted).

In *Byrd*, Judge Wallace concurred only in the result and took exception to the panel's decision "to attempt to 'overrule' the prior three-judge panel decision in *Gibson v. Ortiz*." *Id.* at 867 (Wallace, J., concurring); *see also id.* at 869 ("The majority sees the need to 'overrule' *Gibson* because it assumes that *Gibson* controls the outcome of this case. However, there is a principled distinction between the jury instructions at issue in *Gibson* and the instructions at issue here."). Judge Wallace explained, "The erroneous jury instructions in *Gibson* were not limited to a single element of the crimes charged. Rather, the instructions allowed the jury to find by a preponderance of the evidence that the defendant was guilty of the *entire crime charged*, requiring, the court held, structural error review." *Id.* at 869. In contrast, in *Byrd*, "the alleged erroneous instruction allowed the jury, at most, to test only the element of consent at a lower burden." *Id.*

**[12]** We might first observe that the intervening authority has generated more questions than it has answered. Nevertheless, we believe there is a way to reconcile all these precedents, giving due respect to the holdings of each. Ultimately, we are unpersuaded that *Mendez* has much bearing on this case, due to its unique factual situation, or that the holdings of *Pulido* and *Byrd* address the specific issue raised in *Gibson* or here—the interplay of two instructions combining to allow for a criminal conviction by a preponderance of the evidence.

*Mendez*, despite its involvement with the CALJIC instructions at issue here, does not address the specific legal question before us. Our focus in *Mendez* was that the State had intro-

duced *prior criminal convictions* as opposed to uncharged bad acts based on guilty pleas Mendez had entered. By contrast, in *Gibson* (and here), the State introduced evidence of prior *unadjudicated* acts, as opposed to *convictions*. These crimes have never been found to have occurred by a jury, nor has Doe ever admitted to such acts. Whereas in *Mendez*, "the defendant's uncontested prior convictions allay the concerns articulated in *Gibson* that the defendant could have been convicted on proof less than beyond a reasonable doubt," 556 F.3d at 770, such concerns remain at the forefront here. The State concedes this crucial distinction at Page 49 of its opening brief here: "*Mendez* was primarily based on a factor not present here, that the jury found the defendant's prior convictions were true beyond a reasonable doubt." *Mendez* never purports to contradict *Gibson*, and its unique holding ultimately has no bearing on this case.

*Pulido* and *Byrd* "emphasize[ ] the breadth of trial errors that are subject to harmless error review." *Byrd*, 566 F.3d 864. That is, in all cases where an instructional error does not "vitiate" the jury's findings, harmless error review applies. *See Pulido*, 555 U.S. at 61; *Byrd*, 566 F.3d at 864. In *Pulido*, the state court instructed the jury on multiple substantive theories of guilt,[13] one of which was legally incorrect under state law. 555 U.S. at 59. The Supreme Court recounted the types of instructional errors subject to harmless error review: (1) omission of an element of the offense, *id.* at 60-61 (citing *Neder*, 527 U.S. at 1), (2) erroneous aider and abettor instruction, *id.* at 61 (citing *California v. Roy*, 519 U.S. 2 (1996) (per curiam)), (3) misstatement of an element of the offense, *id.* (citing *Pope v. Illinois*, 481 U.S. 497 (1987)), and (4) erroneous burden shifting, *id.* (citing *Rose v. Clark*, 478 U.S. 570

---

[13]More specifically, the jury received an erroneous felony-murder-liability instruction which allowed a "late-joining" aider and abettor to nevertheless be convicted. *See Pulido*, 555 U.S. at 63-64 (Stevens, J. dissenting); *see also People v. Pulido*, 936 P.2d 1235, 1238-39, 1244-45 (Cal. 1997).

(1986)). To that list, *Pulido* adds error in instructing on multiple theories of guilt. *Id.* ("An instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted."). Because *Byrd* involved a review of Supreme Court cases for AEDPA purposes, *Byrd* takes the holding in *Pulido* and overrules *Gibson* to the extent it is inconsistent with the Supreme Court's holdings solely for purposes of AEDPA review. *Byrd*, 566 F.3d at 866-67.

**[13]** However, *Byrd* has one observation that has caused confusion in this appeal—its characterization that *Gibson* was a case about multiple theories of guilt, which meant there was no error under *Sullivan*. *See* 566 F.3d at 867. But this particular characterization of *Gibson*, which had no bearing on the ultimate holding in *Byrd*, directly contradicts what the *Gibson* panel believed and decided *Gibson* was about: "CALJIC No. 2.50.01 permitted the jury to find Gibson guilty of the charged sexual offenses by merely a preponderance of the evidence, and therefore constituted structural error within the meaning of *Sullivan*." *Gibson*, 387 F.3d at 824. We agree with Judge Wallace that *Byrd*'s post-hoc observation about *Gibson* was pure dictum, by which we are not bound, and to which we give no deference. *See Export Grp. v. Reef Indus., Inc.,* 54 F.3d 1466, 1472-73 (9th Cir. 1995). This case and *Gibson* concern instructional errors which vitiate the jury's findings by lowering the ultimate burden of proof below a reasonable doubt. As we made clear in *Gibson*, "the interplay of the two instructions" leaves a verdict that does not meet the minimum standard under the Sixth Amendment. *See Gibson*, 387 F.3d at 822; *see also id.* at 825 ("A *Sullivan* error precludes harmless error review because no verdict within the meaning of the Sixth Amendment has been rendered."); *Sullivan*, 508 U.S. at 280 ("[T]he most an appellate court can conclude is that a jury *would surely have found* petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt *would surely not have been differ-*

*ent* absent the constitutional error. That is not enough.”). In short, when a court’s erroneous jury instruction impermissibly lowers the burden of proof, that error requires structural error review, not harmless error review. *Mendez*, 556 F.3d at 768.

The jury in Doe’s case was given instructions that permitted a murder conviction based on a preponderance of the evidence that prior uncharged crimes occurred. This instruction, lowering the burden of proof for all charged offenses, is not akin to a prosecutor uttering a false theory of the case or even a judge misstating the elements for conviction under state law. *Pulido*, 555 U.S. at 60-61. Misstating the correct burden of proof is in the category of errors that cannot be balanced or offset by the consideration of competing evidence. Not only is the judge’s misstatement of the burden of proof not an evidentiary issue for the fact-finder, the error occurs after the taking of evidence and necessarily impacts the whole of trial because the judge has allowed the properly received evidence to be filtered through what we called in *Gibson* “an unconstitutional lens.” 387 F.3d at 824.

**[14]** When the jury heard the preponderance instruction in tandem with the reasonable doubt instruction and without a reconciliation from the trial court, the jurors were left to guess which standard to apply. *Id.* at 823-24 (“We are unpersuaded by the warden’s argument that the jury would be able to discard that portion of CALJIC No. 2.01 providing that each fact that supports an inference must be based upon a reasonable doubt (as CALJIC No. 2.50.01’s standard negates), but would nevertheless follow the portion of CALJIC No. 2.01 that requires all facts essential to establishing guilt to be found beyond a reasonable doubt.”). While we presume jurors follow the instructions they are given, we cannot equally assume they can sort out legal contradictions. The instructions directed the jury to consider evidence of Doe’s prior unadjudicated acts of domestic violence, most of which were wholly unrelated to the crimes with which he was charged, to convict him, among other things, of first-degree murder. This

was error under *Sullivan* and *Gibson*, and we affirm the district court's issuance of a conditional writ.

## III.   Petitioner's Ex Post Facto Argument

Doe cross-appeals,[14] arguing that the district court erred by not granting habeas relief on the alternative ground that retroactive application of California Evidence Code § 1109 violated the Ex Post Facto Clause of the United States Constitution. The magistrate judge did not recommend issuing a writ of habeas corpus on this issue, and the district court did not address the issue in its order granting Doe's Petition. We hold that Doe's argument lacks merit.

**[15]** The Ex Post Facto Clause prohibits "states from enacting laws that criminalize an act already performed." *Schroeder v. Tolton*, 493 F.3d 1083, 1087 (9th Cir. 2007). When examining a rule of evidence to determine if it violates this prohibition, courts examine whether the evidentiary rule "affect[s] the quantum of evidence sufficient to convict" the defendant. *Id.* at 1088; *see also Carmell v. Texas*, 529 U.S. 513, 530 (2000).

Here, Section 1109 became effective on January 1, 1997, approximately one month after Roe was killed and five months before Doe's trial began. The statute permits the introduction of evidence of prior domestic violence to demonstrate a defendant's propensity for such behavior. Cal. Evid. Code § 1109. At Doe's trial, the California trial court relied on Section 1109 to permit the prosecution to introduce evidence of prior acts of domestic violence against Roe and Doe's former girlfriends.

**[16]** The decision of the California courts to retroactively apply Section 1109 and allow admission of these prior acts

---

[14]The district court granted Doe's application for a Certificate of appealability on this issue.

was not contrary to clearly established federal law. *See Schroeder*, 493 F.3d at 1088. Section 1109 does not alter the quantum of evidence needed to convict a defendant. *Cf. id.* ("Nothing in the text of [the section] suggests that the admissible propensity evidence would be sufficient, by itself, to convict a person of any crime. [The] [s]ection [ ] relates to admissibility, not sufficiency."). Because the enactment merely permitted the admission of a type of evidence that was previously excluded for the purpose of showing propensity, *id.* at 1088, the use of the evidence at Doe's trial did not contravene the Ex Post Facto Clause.

## CONCLUSION

For the foregoing reasons, the district court's order granting a conditional writ of habeas corpus is **AFFIRMED**.